[No. 41499-6-II.   Division Two.   June 26, 2012.]

JO-ANN FULTON, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Larry J. King*; and *Frederick H. Gautschi III* (of *Gautschi Law Firm LLC*), for appellant.

*Robert M. McKenna*, *Attorney General*, and *Christopher B. Lanese*, *Assistant*, for respondent.

¶1 HUNT, J. — Jo-Ann Fulton appeals the superior court's grant of summary judgment to the Department of Social and Health Services (DSHS) and dismissal of her gender discrimination claim under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. She argues that the superior court erred in ruling that she had failed to establish a prima facie case because (1) under analogous federal law, DSHS's failure to post or to accept applications for the Operations Manager position relieved her of the duty to "apply for" promotion to the position; (2) she introduced evidence that she was "qualified for" the position; and (3) DSHS used an informal selection process to appoint a male candidate instead. Fulton also argues that she sufficiently demonstrated that DSHS's reasons for not promoting her were pretext for gender discrimination.[1]

¶2 Adopting the relaxed federal standards for failure-to-promote cases where an employer does not formally post or accept applications for a job opening, we hold that Fulton

---

[1] DSHS counters that the superior court properly granted summary judgment because Fulton failed to establish a prima facie case, to prove pretext, and to introduce any evidence that DSHS had discriminated against her based on her gender.

did not need to show that she had "applied for" the Operations Manager position to meet her threshold burden under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), for establishing a prima facie case under the unique facts here. Nevertheless, we affirm the superior court's summary judgment dismissal of Fulton's action because she has not shown that DSHS's reasons for hiring a man, instead of promoting her to the Operations Manager position, were pretext for gender discrimination.

## FACTS

### I. Alleged Gender Discrimination

¶3 Fulton worked for DSHS for approximately 26 years (1984 to 2010) until May 31, 2010, when she retired from her position in the Division of Program Support. She had been working as a Medical Assistance Specialist 5 when, on October 17, 2005, Office Chief Kathy Eberle temporarily appointed Fulton "Acting" Operations Manager,[2] without specifying an end date.[3] Clerk's Papers (CP) at 6. Fulton held this temporary Acting Operations Manager position until March 27, 2006, when the Director of the Division of Program Support, Maryanne Lindeblad, temporarily appointed Fulton Acting Office Chief after Eberle left DSHS for another job.[4]

---

[2] Acting Operations Manager was a Washington Management Service (WMS) position for which Fulton did not undergo a formal, competitive recruitment process. According to DSHS, different administrative rules for recruitment and hiring governed this WMS position, in contrast with those applicable to Fulton's permanent "classified" Medical Assistance Specialist 5 position. Clerk's Papers at 89.

[3] Eberle expected Fulton's Acting Operations Manager appointment to last six months while she (Eberle) recruited to hire someone permanent for the position.

[4] Again, DSHS appointed Fulton to this temporary position, also a WMS position, without having her undergo a competitive recruitment process. According to DSHS, however, when Fulton served in the Acting Operations Manager and the Acting Office Chief roles, both WMS positions, her permanent job classification remained her Medical Assistance Specialist 5 position.

¶4 Before leaving DSHS, Eberle asked Fulton if she would hold the Acting Office Chief position until DSHS could "recruit" and "fill" the position. CP at 6. According to Fulton, (1) she initially expressed "reluctance" to become the Acting Office Chief; (2) she finally agreed to hold the position after she received assurances that she would return to the Acting Operations Manager position after DSHS found a permanent Office Chief; and (3) she expressed interest in being appointed as the permanent Operations Manager when she indicated to Eberle that she "liked" the Operations Manager position and that she "wanted to return" to the position after her time as Acting Office Chief expired. CP at 7, 124. According to DSHS, neither Eberle (before she left) nor Lindeblad promised Fulton that she would become the permanent Operations Manager, and Fulton's "return rights"[5] always remained to her previous Medical Assistance Specialist 5 position. CP at 75-76.

¶5 During the next few months, DSHS underwent a reorganization. On August 1, Fulton began reporting to Robert Covington[6] (DSHS Division of Systems and Monitoring), who had assumed the responsibility for filling the Office Chief and Operations Manager positions on a permanent basis.[7] DSHS first posted a job opening for the permanent Office Chief position, accepted applications, and interviewed top candidates based on their resumes and cover letters. Consistent with her earlier expressions to

[5] The record before us does not define this term, which is not pertinent to this appeal.

[6] Covington began supervising Fulton after the reorganization on August 1, 2006. Fulton did not recall any of her interactions with Covington as being particularly "stress[-]inducing." CP at 124. Before the reorganization, Fulton had only a "passing acquaintance with . . . Covington": They had never met one-on-one, and their interactions were limited to large meetings in which other managers were present. After the reorganization, Covington "directly supervised" Fulton for one month before he hired Milton Haire as the Operations Manager. CP at 138.

[7] Before the reorganization, Lindeblad had initiated a competitive recruitment process to fill the Office Chief position, but she had not yet begun recruitment for the Operations Manager position.

Eberle, Fulton did not apply for the Office Chief position. A panel of three managers, including Covington and Lindeblad, interviewed the candidates and unanimously ranked Karen De Leon, a woman, as the top candidate and Milton Haire, a man, as the runner up. On August 22, Covington appointed the top candidate, De Leon, as permanent Office Chief.

¶6 Covington considered the remaining candidates for the Office Chief position so "outstanding" that he asked DSHS's Human Resources Office if he could offer the permanent Operations Manager position to the runner-up, Haire, because he did not want to spend additional time and resources on another competitive recruitment process. CP at 139. Haire exceeded the qualifications of the Operations Manager position: He had over 2.5 years of experience in claims management, over 12 years experience as a manager, extensive knowledge of the Washington State Medicaid Information System, and a working knowledge of federal and state Medicaid laws and regulations. After receiving confirmation from the Human Resources Office that he could fill the position without a formal recruitment process, Covington offered Haire the Operations Manager position.[8] Haire accepted, and on August 31, Covington appointed Haire permanent Operations Manager.

¶7 As was the case with the Office Chief position, Fulton did not apply for the Operations Manager position because, after choosing to select from the existing Office Chief applicant pool, DSHS did not post the job opening. And neither Fulton nor anyone on her behalf had told Covington that she had previously expressed to Eberle an "interest" in

---

[8] According to Covington, in addition to his asking Human Resources for advice, (1) the WMS hiring regulations gave him great "flexibility" in filling WMS positions; (2) he could have "hand-picked" any qualified candidate for the Office Chief and Operations Manager positions, with or without a competitive recruitment process; and (3) he knew of no WMS rules that required formal postings of WMS job openings or interviews for such positions. CP at 61, 138. Lindeblad corroborated that the precise hiring procedures were within Covington's discretion as the appointing authority.

filling the Operations Manager position on a permanent basis or that she had an "expectation" that she would fill the position long-term.[9] CP at 138. Because Fulton had not applied and was not part of the Office-Chief applicant pool, Covington never considered her as a candidate for the permanent Operations Manager position. Like Fulton, Richard Fisher, a male employee who had also formerly served as the "Acting" Operations Manager for two years in the past, was not considered for the permanent Operations Manager position because he, too, had not applied for the Office Chief position.

¶8 After De Leon's and Haire's appointments, Fulton returned to her former position as Medical Assistance Specialist 5. She then began reporting to Haire, whom she had previously supervised.

## II. Procedure

¶9 Nearly three years later, on July 16, 2009, Fulton sued DSHS for gender discrimination[10] for failing to consider her for the permanent Operations Manager position. She sought back pay, front pay,[11] and reasonable attorney fees. DSHS denied that it had discriminated against Fulton based on gender or any other unlawful basis and asserted

---

[9] Moreover, Covington could not recall whether he even knew that Fulton had formerly held the Operations Manager position in an "Acting" capacity.

[10] Although Fulton cited RCW 49.60.160 (superior court contempt powers) as the basis for her gender discrimination action, it appears that she likely intended to bring her lawsuit under RCW 49.60.180, which makes it unlawful for an employer to "refuse to hire," to "bar . . . from employment," or to "discriminate against any person in compensation or in other terms and conditions of employment" because of sex.

[11] "Front pay" compensates an employee for lost future earnings. It represents the difference between what the employee would have earned from his former employer and the amount, if any, he may expect to earn from his new employer. *Hayes v. Trulock*, 51 Wn. App. 795, 802, 755 P.2d 830 (1988).

that Fulton had failed to state a claim upon which relief may be granted.[12]

¶10 DSHS then moved for summary judgment on grounds that (1) Fulton could not establish a prima facie case of gender discrimination because she had not shown that she had "applied for" and was "qualified for" an available position or that such position went to a person outside of her "protected group" (i.e., women);[13] (2) Fulton failed to show that DSHS's reasons for not promoting her were "pretext" for gender discrimination; (3) although Fulton claimed she was unfairly denied the opportunity to apply and to compete for the Operations Manager position, she was not treated any differently than any other employee (male or female) who did not apply for the Office Chief position; and (4) even if Fulton had applied for the Office Chief position, Covington would not have hired her as either the permanent Office Chief or Operations Manager because he "lacked confidence" in her managerial abilities.[14] CP at 27-28.

¶11 Fulton responded that (1) she could establish a prima facie case under the relaxed standards for failure-to-

---

[12] The record does not state whether DSHS ever moved to dismiss Fulton's case for failure to state a claim or whether the superior court ever ruled on such motion.

[13] In its original motion for summary judgment, DSHS argued that Fulton could not show that the position went to a person outside of Fulton's "protected group" (women) because DSHS hired De Leon as the Office Chief. This argument apparently conflated DSHS's two hiring decisions, for Office Chief and Operations Manager, and considered them as "one" hiring decision. DSHS, however, has not renewed this argument on appeal. We, therefore, do not further consider it.

[14] In his declaration, Covington stated:

I would not have appointed [Fulton] to a permanent or acting managerial position. The expectation that I have of my managers in providing leadership is a calmness that is necessary to actually lead people, the ability to provide information to me as well as direction to staff. . . . *Based on my observations with Ms. Fulton, she did not deal well with stressful situations. Rather, she would panic and react chaotically. She demonstrated inadequate people and problem solving skills. I placed a lot of responsibilities on my managers and, in short, I did not have confidence in [Fulton's] abilities to fulfill management responsibilities.*

CP at 62-63 (emphasis added).

promote cases, which federal courts have adopted and which do not require a person to "apply for" a job position if an employer does not give notice of the position's availability; and (2) she could prove that DSHS's reasons for not promoting her were pretextual because DSHS's reliance on the Office Chief candidate pool to fill the Operations Manager position was not a "legitimate," nondiscriminatory reason and Covington's appraisal of her managerial capabilities was "not worthy of belief." CP at 114-16, 120-21.

¶12 After hearing oral argument on DSHS's summary judgment motion, the superior court orally ruled that Fulton had failed to demonstrate a "prima facie case" of gender discrimination. Verbatim Report of Proceedings (VRP) at 18. The superior court then entered an order granting DSHS summary judgment and dismissing Fulton's gender discrimination claim with prejudice. Fulton appeals.

## ANALYSIS

¶13 Fulton argues that the superior court erred in granting summary judgment to DSHS because (1) she did not need to show that she had "applied for" the Operations Manager position under the relaxed standards that federal courts have used in failure-to-promote cases and, therefore, established a prima facie case of gender discrimination; and (2) she sufficiently showed that DSHS's reasons for not promoting her were pretext for gender discrimination.

¶14 We agree with Fulton that, under the facts of this case and under the relaxed federal standards for failure-to-promote cases, she did not need to show that she had "applied for" the Operations Manager position in order to meet her initial burden of establishing a prima facie gender discrimination case under the *McDonnell Douglas* burden-shifting scheme. Nevertheless, we affirm summary judgment because she later failed to demonstrate that DSHS's reasons for not promoting her were pretext for gender discrimination.

## I. Standard of Review; *McDonnell Douglas* Burden-Shifting Scheme

### A. Summary Judgment

■ ¶15 We review an order granting summary judgment de novo, engaging in the same inquiry as the superior court. *Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 65, 837 P.2d 618 (1992). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Kirby v. City of Tacoma*, 124 Wn. App. 454, 463, 98 P.3d 827 (2004). We consider all facts submitted and all reasonable inferences from those facts in the light most favorable to the nonmoving party. *Kirby*, 124 Wn. App. at 463. If reasonable minds could reach but one conclusion from the admissible facts in evidence, summary judgment is proper. *Haubry v. Snow*, 106 Wn. App. 666, 670, 31 P.3d 1186 (2001). And we may affirm a superior court's ruling on any grounds the record adequately supports. *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027, *cert. denied*, 493 U.S. 814 (1989).

■■ ¶16 To defeat an employer's motion for summary judgment in an employment discrimination case, an employee "must do more than express an opinion or make conclusory statements." *Hiatt*, 120 Wn.2d at 66; *see also Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996). The employee must establish *specific and material facts* to support each element of her prima facie case. *Hiatt*, 120 Wn.2d at 66. Federal employment law rulings are also "a source of guidance" when construing provisions under WLAD, but they are not binding precedent. *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 361-62, 753 P.2d 517 (1988). Fulton failed to meet her burden here.

## B. *McDonnell Douglas*

■ ¶17 When evaluating summary judgment motions in employment discrimination cases under WLAD, Washington courts have largely adopted the federal burden-shifting scheme announced in *McDonnell Douglas*, 411 U.S. 792.[15] This burden-shifting scheme is commonly used where, as here, a plaintiff has brought an individual, disparate treatment lawsuit[16] and she lacks direct evidence[17] of discriminatory motive. *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 180, 23 P.3d 440 (2001), *overruled on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006); *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 354, 172 P.3d 688 (2007). Under this burden-shifting scheme, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Hill*, 144 Wn.2d at 181. If the plaintiff fails to establish a prima facie case, the defendant is entitled to judgment as a matter of law. *Hill*, 144 Wn.2d at 181.

---

[15] *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 180, 23 P.3d 440 (2001), *overruled on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006); *Grimwood*, 110 Wn.2d at 363-64 (applying *McDonnell Douglas* scheme to summary judgments).

[16] " 'Disparate treatment . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or [other protected characteristic].' " *Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 354 n.7, 172 P.3d 688 (2007) (alterations in original) (internal quotation marks omitted) (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003)). Liability in a disparate-treatment case " 'depends on whether the protected trait . . . *actually motivated* the employer's decision.' " *Hegwine*, 162 Wn.2d at 354 n.7 (emphasis added) (alteration in original) (internal quotation marks omitted) (quoting *Raytheon Co.*, 540 U.S. at 52).

[17] "Direct evidence" includes discriminatory statements by a decision maker and other " 'smoking gun' " evidence of discriminatory motive. *Hill*, 144 Wn.2d at 179; *Dumont v. City of Seattle*, 148 Wn. App. 850, 867, 200 P.3d 764 (2009) (citing 1 BARBARA T. LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 60-82 (4th ed. 2007)). Because such evidence is necessarily rare, the *McDonnell Douglas* burden-shifting scheme allows a plaintiff to prove discriminatory motive through circumstantial evidence. *Hill*, 144 Wn.2d at 179-80.

¶18 If, however, the plaintiff succeeds in establishing a prima facie case, a " 'legally mandatory, rebuttable presumption' " of discrimination *temporarily* takes hold[18] and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Hill*, 144 Wn.2d at 181. If the defendant fails to meet its burden, the plaintiff is entitled to an order establishing liability as a matter of law because no issue of fact remains in the case. *Hill*, 144 Wn.2d at 181-82. But if the defendant provides a nondiscriminatory reason for its employment action, the presumption established by the plaintiff's prima facie case is rebutted and it " 'simply drops out of the picture.' " *Hill*, 144 Wn.2d at 182 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

¶19 The burden then shifts back to the plaintiff to show that the defendant's reason is actually pretext for what, in fact, is a discriminatory motive. *Hill*, 144 Wn.2d at 182; *Grimwood*, 110 Wn.2d at 364. If the plaintiff fails to make this showing, the defendant is entitled to judgment as a matter of law. *Hill*, 144 Wn.2d at 182. The plaintiff's ultimate burden at trial in a disparate treatment lawsuit is to present evidence sufficient for a reasonable trier of fact to conclude that the defendant's alleged discriminatory motive was more likely than not a substantial factor in its adverse employment action. *Hill*, 144 Wn.2d at 186-87 (citing *Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 311, 898 P.2d 284 (1995)). Thus, the superior court should submit the case to a jury only when it determines that all three facets of the *McDonnell Douglas* burden-shifting scheme are met and that the parties have produced sufficient evidence supporting *reasonable but competing* inferences of *both* discrimination *and* nondiscrimination. *Hill*, 144 Wn.2d at 186; *Barker v. Advanced Silicon Materials, LLC*, 131 Wn. App. 616, 624, 128 P.3d 633, *review*

---

[18] *Hill*, 144 Wn.2d at 181 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n.7, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

*denied*, 158 Wn.2d 1015 (2006) (applying the same standard in a summary judgment case). Otherwise, summary judgment is appropriate.

## II. Prima Facie Case Does Not Require Application for Position

¶20 The sole prima facie element before us is whether Fulton needed to prove that she had "applied for" the Operations Manager position. Ordinarily, to prove a prima facie case of female gender discrimination under WLAD in the failure-to-promote context, a plaintiff must show that (1) she is a woman, (2) she "applied [for]" and was "qualified for" an available promotion, (3) she was not offered the position, and (4) the promotion went to a male. *Barker*, 131 Wn. App. at 623-24; *Kuyper v. Dep't of Wildlife*, 79 Wn. App. 732, 735, 904 P.2d 793 (1995). Although the parties here had disputed other elements of Fulton's prima facie case below, on appeal DSHS argues only that Fulton failed to meet part of the *second* element—that she had "applied for" the Operations Manager position.[19] *See* Br. of Resp't at 14-22.

¶21 Fulton admits that she did not apply for the Operations Manager position. But she claims she did not need to show that she had "applied for" the position because (1) DSHS did not accept applications for the position and, instead, used an informal selection process to appoint a candidate; (2) this informal selection process denied her the ability to apply for the position; and (3) she had formerly "expressed an interest" in the position. Br. of Appellant at 22-24. Fulton cites several federal cases construing Title

---

[19] Below DSHS argued that Fulton had failed to satisfy both the second and fourth elements of this test. On appeal, however, DSHS no longer addresses whether Fulton was "qualified for" the Operations Manager position or that the position did not go to a person outside of Fulton's protected group. *See* Br. of Resp't at 14-22.

VII of the Civil Rights Act of 1964 (Title VII),[20] 42 U.S.C. § 2000e, which, she claims, abandon the "application" element of a plaintiff's prima facie case under these circumstances.[21] Br. of Appellant at 16-17, 19-22. She does not, however, direct us to any Washington cases applying these relaxed standards under WLAD; nor have we found any.

¶22 DSHS argues that the relaxed federal standards' dispensing with the "applied for" prima-facie-case element applies only in "unusual case[s]" when there is *other evidence of an employer's discriminatory intent*, such as when a plaintiff was "deterred" from applying for a job opening or when the plaintiff believed that an application would be "futile" based on an employer's discriminatory practices.[22] Br. of Resp't at 14-15. DSHS contends that, because neither of these scenarios applies here, we need not apply these federal standards in determining whether Fulton met her prima facie burden under WLAD. We disagree.

---

[20] Fulton did not bring her claim under Title VII. But our courts have used Title VII case law as nonbinding, persuasive authority when interpreting and construing WLAD. *Oliver v. Pac. Nw. Bell Tel. Co.*, 106 Wn.2d 675, 678, 724 P.2d 1003 (1986).

[21] *See Equal Emp't Opportunity Comm'n v. Metal Serv. Co.*, 892 F.2d 341 (3d Cir. 1990); *Lowe v. City of Monrovia*, 775 F.2d 998 (9th Cir. 1985); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir. 1984).

[22] *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-68, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977) (plaintiffs proved prima facie case by showing they were "deterred" from applying for jobs where employer had significant racial disparities in its workforce and plaintiffs introduced considerable testimony of specific acts of discrimination); *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 758 n.3, 761-62 (9th Cir. 1980) (plaintiff believed applying to company's special training program would be "futile" where the employer described the program as " 'The Plan for Every Man' " and as being available to " 'men under 35 . . . ' "). Unlike Fulton's *individual* disparate treatment claim, however, these cases generally involve a systemic, or class-wide, "pattern or practice" of discrimination based on Title VII, section 707(a), codified as amended at 42 U.S.C. § 2000e-6(a). *See, e.g., Teamsters*, 431 U.S. at 334-36; *Klindt v. Honeywell Int'l Inc.*, 303 F. Supp. 2d 1206, 1216 (D. Kan. 2004); *Lockridge v. Bd. of Trs. of Univ. of Ark.*, 315 F.3d 1005, 1010-11 (8th Cir. 2003); *Oda v. State*, 111 Wn. App. 79, 95 n.6, 44 P.3d 8 (2002) (defining "pattern" or "practice" under Title VII, section 707(a)).

## A. Federal Standards

¶23 As the United States Supreme Court has specifically cautioned, and our state Supreme Court has agreed, "The prima facie case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic' " or the exclusive means of proving a discrimination claim.[23] Because the facts in employment discrimination cases vary, the *McDonnell Douglas* model for proving a plaintiff's prima facie case "is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13. Instead, the *McDonnell Douglas* prima facie elements should be used "flexibly to address the facts in different cases" and should not be " 'viewed as providing a format into which all cases of discrimination must some-how fit.' " *Johnson v. Dep't of Soc. & Health Servs.*, 80 Wn. App. 212, 227 n.21, 907 P.2d 1223 (1996); *Grimwood*, 110 Wn.2d at 363 (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1016-17 (1st Cir. 1979)).

¶24 At the summary judgment stage, a plaintiff's prima facie burden is "not onerous." *Burdine*, 450 U.S. at 253; *see also Johnson*, 80 Wn. App. at 227 n.21. The "requisite degree of proof necessary to establish a prima facie case . . . is *minimal* and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (emphasis added and omitted). Although federal cases interpreting Title VII are not binding law in Washington, we look to federal law for guidance when construing WLAD; and we will adopt "those theories and rationale[s] which best further the purposes and mandates of our state statute." *Grimwood*, 110 Wn.2d at 361-62.

---

[23] *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)); *see also Grimwood*, 110 Wn.2d at 363 (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1016-17 (1st Cir. 1979); *Teamsters*, 431 U.S. at 358).

¶25 Federal courts have eliminated the *McDonnell Douglas* "applied for" requirement in individual disparate treatment cases, such as Fulton's, where an employer does not use formal procedures for posting or accepting applications for a promotion opportunity or for determining who will be offered the position. In *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir. 1984), the Eleventh Circuit Court of Appeals noted that such informal procedures could lead to discrimination because important information about available promotions could be limited to a segment of the workforce, and such procedures do not place a "check" on individual decision-maker biases.[24] Under such circumstances, the court held that (1) a plaintiff could make out a prima facie case and create a presumption of discrimination as long as the plaintiff proved that his employer had "some reason or duty to consider him for the post"; and (2) when an employer uses informal procedures to select job candidates, it has a "duty to consider . . . all [employees] who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest." *Carmichael*, 738 F.2d at 1133.

¶26 As *Carmichael* explained, a plaintiff's prima facie case raises the presumption of discrimination because it eliminates the most common reasons for rejecting a job applicant, including an employee's lack of qualifications and an employer's lack of an available job. *Carmichael*, 738 F.2d at 1133. The paradigmatic *McDonnell Douglas* prima facie case also requires a plaintiff to prove that he "applied for" a job opening to eliminate another obvious nondiscriminatory reason: that the plaintiff was not offered the job *because the employer did not know that he was interested*. *Carmichael*, 738 F.2d at 1133. The rationale for this job-application requirement dissolves, however, where an em-

---

[24] The Eleventh Circuit did not require a plaintiff to show that he had applied for an open position where his employer did not have formal procedures for posting notice of promotion opportunities or for determining who would be offered such promotions; rather, the company relied on "word of mouth" and informal review procedures to select candidates. *Carmichael*, 738 F.2d at 1133.

ployer does not formally post or accept applications for a promotion opportunity. Under these circumstances, the plaintiff does not have a ready means of proving that he gave his employer notice of his interest in the job:

> *McDonnell Douglas* "align[s] closely the prima facie case with proof of elements *within the plaintiff's own objective knowledge.*" By showing that he applied [for an available job opportunity], the plaintiff shows that the employer knew he was interested in the job. *But when there is no formal notice of the job's availability, the plaintiff may have no means, within his own knowledge, of showing whether the employer considered him or not.*

*Carmichael*, 738 F.2d at 1133 (emphasis added) (first alteration in original) (citations omitted).

¶27 The Sixth Circuit similarly applied the *Carmichael* rule in a race discrimination case where a company promoted an African-American plaintiff several times, eventually putting him in a managerial position. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1017 (6th Cir. 2001). The company then underwent several reorganizations and downsizings; each time, the company relocated the plaintiff and retained him as an employee, but it passed him up for promotion opportunities as they became available. *Dews*, 231 F.3d at 1017-18. The company created several Regional Sales Manager positions that it did not post or submit to a formal application process; these positions became the subject of the plaintiff's race discrimination lawsuit when he was not selected for promotion. *Dews*, 231 F.3d at 1018-19. The company admitted that it had filled the positions with internal candidates without accepting applications and that it had not considered any employees for promotions other than those that it had ultimately promoted. *Dews*, 231 F.3d at 1018-19, 1021.

¶28 The Sixth Circuit rejected the trial court's conclusion that the plaintiff had failed to make a prima facie case under *McDonnell Douglas* simply because he had not submitted an application for a Regional Sales Manager posi-

tion: "[I]t would [have] be[en] *impossible*" for any plaintiff to meet the application requirement because there was no formal mechanism through which he could apply. *Dews*, 231 F.3d at 1021 (emphasis added). The Sixth Circuit held that a plaintiff does not need to show that he applied for a promotion opportunity if his employer does not notify its employees of the promotion or provide a formal mechanism for expressing an interest in such promotion. *Dews*, 231 F.3d at 1022.

¶29 The Eighth Circuit also stated it would apply the *Carmichael* rule under similar circumstances where an employee did not have notice of a newly-available job opportunity[25] because:

"It would be ironic—bizarre, in fact—if a victim of discrimination [was] unable to vindicate [his] rights because [he] had the peculiar misfortune of being discriminated against in a way that necessarily prevented [him] from making [his] prima facie case."

*Kehoe v. Anheuser-Busch, Inc.*, 96 F.3d 1095, 1105 n.13 (8th Cir. 1996) (quoting *Shannon v. Ford Motor Co.*, 72 F.3d 678, 682 (8th Cir. 1996)). In reaching this conclusion, the Eighth Circuit implicitly recognized that an individual decision-maker might subjectively withhold information about an available job opportunity based on discriminatory animus and thereby cause the plaintiff to suffer adverse employment action. Other federal courts have reached similar conclusions and applied a version of the *Carmichael* rule.[26]

---

[25] In *Kehoe*, a plaintiff in an age discrimination case presented evidence that his supervisors knew they were going to eliminate his job position while they simultaneously interviewed candidates for another job opening that had recently become available; and his supervisors did not tell him that they were eliminating his job position until *after* they filled the open position with a younger candidate. *Kehoe v. Anheuser-Busch, Inc.*, 96 F.3d 1095, 1100, 1105 n.13 (8th Cir. 1996). Like Fulton, Kehoe did not have notice of the available job opportunity and, thus, had not applied for the open position. *Kehoe*, 96 F.3d at 1100.

[26] *Metal Serv. Co.*, 892 F.2d at 348 (failure to formally apply for a job opening does not bar a plaintiff from establishing a prima facie case where the plaintiff made every reasonable attempt to convey his interest in the job to the employer);

¶30 Although articulating the rule slightly differently, the federal courts appear to agree that there should be no "applied for" element in a plaintiff's prima facie failure-to-promote case where an employer neither formally posts or accepts applications for a promotion opportunity nor has another formal mechanism for employees to learn about and to express an interest in such position.

## B. Application of Relaxed Federal Standards to Fulton's Case

¶31 We are persuaded to apply the relaxed federal standards for failure-to-promote discrimination cases to the unique facts here: DSHS did not advertise, post a notice, or accept applications for the Operations Manager position. Nor did DSHS give notice that it would select a permanent Operations Manager from the candidates who had applied for the advertised Office Chief position. If we were to apply *Barker's* four prima-facie-case elements rigidly,[27] Fulton would be unable to establish the second element (that she applied for the position) because she was never given notice of or an opportunity to "apply for" the position. But if we apply these four prima-facie-case elements *flexibly*, as our Supreme Court has admonished,[28] Fulton can establish a prima facie case of gender discrimination based on (1) her being a woman, (2) her being qualified for the position,[29]

---

*Bernard v. Gulf Oil Corp.*, 841 F.2d 547, 570 (5th Cir. 1988) (where employer did not publish vacancy or create formal application process, plaintiff need not prove she applied for the position to establish prima facie case of discrimination); *Ferguson v. E.I. duPont de Nemours & Co.*, 560 F. Supp. 1172, 1192-93 (D. Del. 1983) (where job vacancies not posted or advertised, plaintiff's "generalized expression of interest can be considered an application" even though communicated interest was actually for another position).

[27] *Barker*, 131 Wn. App. at 623-24.

[28] *Grimwood*, 110 Wn.2d at 363 (quoting *Loeb*, 600 F.2d at 1016-17).

[29] Although the parties have not briefed whether Fulton was "qualified for" the Operations Manager position, we note that she had formerly held the position in an "Acting" capacity with no evidence that she performed poorly, which federal courts have held sufficient to establish that a plaintiff was qualified for the position. *See Lyons v. England*, 307 F.3d 1092, 1114-15 (9th Cir. 2002) (holding

(3) her not having been offered the position, and (4) DSHS's awarding the permanent position to a male.

¶32 Adopting the *Carmichael* rule rationale, we hold that, under the facts here, where Fulton's employer did not advertise or accept applications for the position sought, she did not need to show that she had applied for the Operations Manager position in order to establish a prima facie case of gender discrimination. This holding, however, does not end our inquiry; rather, it merely allows Fulton to proceed to the next step of the *McDonnell Douglas* burden-shifting scheme, which requires DSHS to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Hill*, 144 Wn.2d at 181. If DSHS provides such reason, the burden falls back on Fulton to produce admissible evidence sufficient to create a triable issue of fact as to whether DSHS's reasons for not promoting her were pretext for discrimination. *Barker*, 131 Wn. App. at 624.

### III. Legitimate, Nondiscriminatory Reason for Hiring Another

¶33 DSHS argues that it provided at least three legitimate, nondiscriminatory reasons for not promoting Fulton to Operations Manager: (1) Covington relied on the Office Chief candidate pool to fill the Operations Manager position; (2) he did not know that Fulton had previously expressed an interest in the Operations Manager position; and (3) he had doubts about Fulton's managerial capabilities and did not consider her the "most qualified" candidate for the position. Br. of Resp't at 29-30. In its appellate brief and its summary judgment memoranda and accompanying affidavits below, DSHS also articulates two corollary reasons why Covington chose an informal selection process to fill the Operations Manager position rather than a sepa-

---

that the plaintiffs introduced circumstantial evidence that they were "qualified" where their employer did not post job openings but they each formerly held the position in question).

rate, formal recruitment procedure like it had with the Office Chief position: He felt the Office Chief recruitment had identified several qualified Operations Manager candidates, and he wanted to conserve state resources. We hold that DSHS met its burden of producing a legitimate, nondiscriminatory reason for its hiring decision.

■ ¶34 Fulton primarily cites *Carmichael* and two other Eleventh Circuit cases[30] to argue that DSHS's reliance on the Office Chief candidate pool is a " 'legally insufficient and illegitimate' " reason for denying her a promotion because it stems from the same informal hiring procedure that prevented her from applying for the Operations Manager position. Br. of Appellant at 30 (quoting *Carmichael*, 738 F.2d at 1134); Reply Br. of Appellant at 17-18. She also appears to suggest that, under a secondary holding announced in *Carmichael*, an employer's use of an informal hiring procedure can *never* be a legitimate, nondiscriminatory reason as a matter of law. We disagree.

¶35 In our view, Fulton misreads *Carmichael*'s secondary holding, which is:

> [An] employer cannot avoid a Title VII violation by showing that it *incorrectly assumed that the plaintiff was uninterested* in the job [after using an informal hiring procedure]. When the plaintiff had no notice of or opportunity to apply for the job, such a reason for rejection is "legally insufficient and illegitimate".

*Carmichael*, 738 F.2d at 1133-34 (emphasis added) (quoting *Harris*, 712 F.2d at 1383-84). The *Carmichael* court further stated that, given the plaintiff's evidence of racial disparities in the employer's workforce, the court should "consider the possibility that the defendant *assumed* [the plaintiff] would not be interested . . . *because he [was] black*."[31] *Carmichael*, 738 F.2d at 1134 (some emphasis added).

---

[30] *Harris v. Birmingham Bd. of Educ.*, 712 F.2d 1377 (11th Cir. 1983); *Jones v. Firestone Tire & Rubber Co.*, 977 F.2d 527 (11th Cir. 1992).

[31] We note that the Eleventh Circuit reached a similar conclusion in *Harris* and in *Jones*. In *Harris*, which predated *Carmichael*, the Eleventh Circuit held that a

¶36 Contrary to Fulton's contention, under *Carmichael* and other Eleventh Circuit cases,[32] an employer cannot avoid a Title VII violation by claiming that it "incorrectly assumed" that an employee was not interested in a job position where (1) the employer's informal selection process gave rise to the employer's false assumption, and (2) there is evidence that the employer may have assumed that the employee was not interested in the job based on that employee's membership in a protected class. *Carmichael* and other cases following this rule, however, do *not* invalidate *all* informal selection procedures that an employer might undertake in filling a job opening or any related nondiscriminatory reason that an employer might give for its decision to use an informal hiring process. Rather, in disparate treatment cases, it is an employer's improper *motive* for using an informal hiring process that may give rise to a discrimination claim, not the mere fact that the employer used an informal process.[33]

¶37 Moreover, other federal circuit Courts of Appeals have affirmed summary judgment for an employer that

---

school district's false *assumption*—that an African-American coach *was not interested* in the head football coach position—was not a legitimate reason for not considering him for promotion where this false assumption was "caused by" the district's informal process of allowing several school administrators to evaluate and to identify promotion candidates. *Harris*, 712 F.2d at 1381-83. In *Jones*, a later-decided case, the Eleventh Circuit again relied on the language from *Carmichael* that an employer cannot avoid a Title VII violation by claiming it "incorrectly *assumed* that the plaintiff was uninterested" in the job. *Jones*, 977 F.2d at 533.

[32] *See supra* note 30.

[33] According to one employment discrimination law treatise:

Employers that have internal procedures in place for advertising and accepting applications for promotional positions *do not automatically discriminate by failing to follow their procedures.* Ignoring internal procedures to favor a specific employee because of a romantic interest or to settle a claim of discrimination made by an employee, for instance, will usually not support a finding of discrimination.

. . . Though employers can rely on informal methods of advertising and filling promotional vacancies, *they violate the law if they act with the purpose or intent* of preventing individuals in protected groups from competing for the positions.

1 LINDEMANN & GROSSMAN, *supra*, at 1129-30 (emphasis added) (footnotes omitted).

used an applicant pool from a higher-level position to fill a lower-level position, without considering such informal procedures "illegitimate" as a matter of law. *See, e.g., Adeyemi v. District of Columbia,* 381 U.S. App. D.C. 128, 525 F.3d 1222, 1228-29, *cert. denied,* 555 U.S. 1036 (2008); *Salter v. U.S. Dep't of Veterans Affairs,* 252 F. App'x 804, 805 (9th Cir. 2007).[34] In relying on the higher-level applicant pool, the employer in *Salter* had failed to follow its own internal hiring procedures; nevertheless, the Ninth Circuit determined this was not dispositive because Salter had failed to explain how her employer's decision had been motivated by racial animus. *Salter,* 252 F. App'x at 805.

¶38 Similarly, here, Fulton does not explain how DSHS's decision to use an informal process to fill the Operations Manager position was motivated by discrimination against her gender, as opposed to Covington's stated desire to conserve state resources or his belief that the Office Chief candidates were "outstanding" and highly qualified for the lower-level position that she wanted. CP at 60. Nor did she offer any independent evidence that there were statistical gender disparities in DSHS's workforce or that it had erroneously assumed she was uninterested in the Operations Manager position because of her gender (as was the case with the plaintiff in *Carmichael*). Accordingly, we hold that Fulton has failed to show that (1) DSHS's reliance on the Office Chief candidate pool was an "illegitimate" reason as a matter of law; and (2) such a reason may satisfy DSHS's obligation to produce a legitimate, nondiscriminatory reason for its employment action.

## IV. FAILURE TO SHOW PRETEXT

¶39 Because DSHS has articulated legitimate, nondiscriminatory reasons for its hiring action, the burden shifts back to Fulton to produce admissible evidence sufficient to

---

[34] Fed. R. App. P. 32.1(a) allows citation to its unpublished opinions for persuasive value. GR 14.1(b).

create a triable issue of fact as to whether DSHS's articulated reasons were "pretext" and that gender discrimination was, in fact, a substantial factor in its employment decision. *Barker*, 131 Wn. App. at 624. To prove pretext, Fulton again argues that DSHS's reliance on the Office Chief candidate pool was an "illegitimate"[35] reason and that Covington's assessment of her managerial capabilities was not "credible" because he had not observed her in a managerial capacity before he hired Haire. Br. of Appellant at 30-31. These arguments fail.

¶40 To prove pretext, a plaintiff must show that the defendant's articulated reasons (1) had no basis in fact, (2) were not really motivating factors for its decision, (3) were not temporally connected to the adverse employment action, or (4) were not motivating factors in employment decisions for other employees in the same circumstances. *Kuyper*, 79 Wn. App. at 738-39. Only when the parties meet their evidentiary burdens under all three prongs of the *McDonnell Douglas* burden-shifting scheme and the record contains evidence supporting *reasonable but competing* inferences of both discrimination and nondiscrimination should the superior court send the case to a jury. *Hill*, 144 Wn.2d at 186; *Barker*, 131 Wn. App. at 624. Such was not the case here.

¶41 A plaintiff's prima facie case, plus evidence sufficient to disbelieve an employer's explanation, will ordinarily, but not necessarily, suffice to submit the case to a jury trial. *Hill*, 144 Wn.2d at 185. Nonetheless, a court may grant summary judgment to an employer if

"the record *conclusively reveal*[s] some other, nondiscriminatory reason for the employer's decision, *or* if the plaintiff created only a *weak issue of fact as to whether the employer's*

---

[35] Although characterizing as "illegitimate" DSHS's reliance on the Office Chief candidate pool to fill the Operations Manager position, Fulton does not make a separate pretext argument for this legitimate, nondiscriminatory reason. We, therefore, do not address this part of her argument at length in this section of our opinion.

*reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."*

*Hill*, 144 Wn.2d at 184-85 (some emphasis added) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)); *see also Milligan v. Thompson*, 110 Wn. App. 628, 637, 42 P.3d 418 (2002) (applying rule to summary judgment).

¶42 Here, at best, Fulton created only a weak issue of fact as to whether DSHS's articulated reasons were untrue: After insufficiently demonstrating that DSHS's reliance on the Office Chief candidate pool was an "illegitimate" reason, she did not separately mount or support an argument that the reason was "pretextual" or not worthy of belief. And, although Fulton claims that Covington's assessment of her managerial capabilities was "not credible," the record shows that he *had* supervised her for one month before he appointed Haire and that Covington had interacted with Fulton at department-wide meetings before the reorganization in August 2006. Br. of Appellant at 31. Thus, Covington had some opportunity to assess her managerial abilities. We have also held that an employee's disagreement with her supervisor's assessment of her job performance does not demonstrate pretext or "give rise to a reasonable inference of discrimination." *Parsons v. St. Joseph's Hosp. & Health Care Ctr.*, 70 Wn. App. 804, 811, 856 P.2d 702 (1993). Beyond these two failed claims, Fulton makes no other pretext arguments.

¶43 In addition to the uncontroverted legitimate, nondiscriminatory reasons we noted earlier in this opinion, DSHS supported its articulated reasons with further evidence that Covington's hiring decision was *not* motivated by gender: (1) During the same recruitment and hiring process that it used to fill the Operations Manager position, Covington had hired a *woman*, DeLeon, for the Office Chief position, a higher position than the Operations Manager position to which Fulton aspired; (2) Fulton was not affirmatively denied access to information about the Opera-

tions Manager selection procedures; and (3) she was not treated any differently than any other DSHS employee— *male or female*—who did not similarly apply for the Office Chief position. For example, DSHS similarly neither considered nor "promoted" Richard Fisher, a man who had previously held the Operations Manager position in an "Acting" capacity for two years and who also did not apply for the higher Office Chief position. CP at 62. Again, Fulton does not rebut these arguments.

¶44 To succeed in a gender discrimination claim based on disparate treatment, a plaintiff must demonstrate that he or she was treated differently than persons of the opposite sex who are otherwise similarly situated. *Marquis*, 130 Wn.2d at 113 (citing *Ellingson v. Spokane Mortg. Co.*, 19 Wn. App. 48, 54, 573 P.2d 389 (1978)). The record shows that DSHS treated Fulton "differently" than Haire only to the extent that he had applied for the Office Chief position and, thus, was in the pool of candidates from which Covington selected the permanent Operations Manager. But because Haire had previously applied for the Office Chief position, he and Fulton were not "similarly situated" employees. The record further shows that DSHS treated Fulton the *same* as it treated Fisher and other male employees in her situation, namely, male employees who similarly had not applied for the Office Chief position and, therefore, were not already in the candidate pool.

¶45 Accordingly, we conclude that (1) the record does not contain evidence supporting a *reasonable* inference that DSHS discriminated against Fulton based on her gender; (2) Fulton failed to produce admissible evidence sufficient to create a triable issue of fact as to whether DSHS's articulated reasons were "pretext" for gender discrimination; and (3) the superior court's summary judgment order was proper.

¶46 We adopt the federal courts' relaxed standards for failure-to-promote cases and hold that Fulton did not need to establish that she had "applied for" the Operations

Manager position to make a prima facie case under WLAD. Nevertheless, we affirm the superior court's summary judgment order on other grounds adequately supported in the record,[36] namely, that Fulton did not sufficiently demonstrate that DSHS's reasons for failing to offer her the permanent Operations Manager position were pretext for gender discrimination.

JOHANSON, A.C.J., and ARMSTRONG, J., concur.

---

[36] Although the superior court did not specify which portion of Fulton's prima facie case she had failed to prove, its questions suggest that it based its ruling on Fulton's failure to "apply for" the Operations Manager position. *See* VRP at 13-14. Moreover, the superior court did not address any other elements of Fulton's prima facie case or evaluate the parties' pretext arguments. Nevertheless, we may affirm a superior court's ruling on any grounds adequately supported in the record. *LaMon*, 112 Wn.2d at 200-01. And we do so here.