IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| MAURICE CRAIN, Individually, | No. 49135-4-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES, WESTERN STATE HOSPITAL, | UNPUBLISHED OPINION |
| Respondent. | |

WORSWICK, J. — Maurice Crain, an African-American man, appeals the trial court's summary judgment dismissal of his employment discrimination lawsuit against the Department of Social and Health Services (DSHS). Crain argues that the trial court erred in granting DSHS's motion for summary judgment because the trial court misapplied summary judgment standards relating to employment discrimination claims and there is a genuine issue of material fact regarding whether Crain's race was a substantial factor in DSHS's decision to terminate him. Finding no error, we affirm summary judgment.

FACTS

Crain began working for Western State Hospital in 1990. Crain was later promoted to the position of psychiatric security attendant. Due to an incident unrelated to this case, Crain was working pursuant to a "Last Chance Agreement." The Last Chance Agreement stated that Crain would "strictly comply with DSHS policies" and that if DSHS determined that Crain committed further acts of misconduct, he must voluntarily resign from his position. CP (Clerk's Papers) at

124. The Last Chance Agreement also provided that DSHS "may immediately terminate [Crain's] employment for any violation of [the] Agreement." CP at 125.

On September 6, 2012, Crain was working in the legal offender unit and was responsible for monitoring patient safety and observing patient behavior. During the unit's mealtime, Crain and Diane Parsons, a licensed practical nurse, escorted a patient, R.K.,[1] to his room to eat his meal. A few minutes later, R.K. exited his room and fell to the floor in a praying position. Hospital policy prohibited patients from lying on the floor, although R.K. was known to kneel in a praying position regularly.

Five hospital employees, including Crain, walked past R.K. as he lay on the floor outside of his room.[2] Crain walked past R.K. at least four times and neither verbally nor physically checked to see if R.K. was responsive. After R.K. had lain on the floor for approximately seven minutes, Parsons noticed that R.K. was choking and unable to breathe. Parsons asked for Crain's assistance and began chest compressions and mouth sweeps to dislodge food stuck in R.K.'s throat. R.K. was transported to a neighboring hospital and died two days later.

Following R.K.'s death, Western State Hospital reassigned Crain and the four other employees, who walked past R.K. while he was lying on the floor, to different departments within the hospital. The four other employees included: Victoria David, a mixed race supervising nurse; Margaret Karimi, an African-American non-permanent psychiatric security attendant; Parsons, a Caucasian licensed practical nurse; and James Smith, an African-American psychiatric security attendant.

---

[1] We use R.K.'s initials to protect his privacy.

[2] Much of this incident was recorded by Western State Hospital's surveillance video cameras.

Western State Hospital reported R.K.'s death to both the Department of Health and the Lakewood Police Department. The Department of Health determined it would not take any disciplinary action regarding Crain's nursing assistant license. Based on the Lakewood Police Department's report, the Pierce County Prosecuting Attorney's Office elected to not pursue criminal negligence charges against any hospital employees.

In addition, the Washington State Patrol conducted an administrative investigation. Based on the Washington State Patrol's findings, DSHS decided to terminate Crain, Parsons, and Smith. David resigned under a settlement agreement with the hospital, and Karimi's employment contract was not renewed.

Following DSHS's decision to terminate him, Crain received a "Notice of Intent to Discipline" from Western State Hospital's CEO, Ronald M. Adler. CP at 113-21. The notice of intent to discipline stated:

> You were identified on the camera surveillance video walking by patient RK during this incident. By your own admission you did not physically check on patient RK or ask if he was "ok." Your failure to assess patient RK, who was later identified as choking, led to his need for resuscitation.

CP at 113. Crain was also informed that he had violated the Last Chance Agreement and that he had committed ethical violations for his dishonesty. Crain reported that he knelt down and assessed R.K., determining that R.K.'s skin color and breathing did not indicate that he was in distress. However, Crain's statements were inconsistent with video surveillance and his own statements to the Washington State Patrol, which showed that Crain did not assess R.K.'s skin color and did not kneel down near R.K.

Later, Crain received a "Notice of Dismissal" from Adler. CP at 95. The notice of dismissal notified Crain that he was being terminated because of his "failure to assess a patient

3

who was lying on the floor; [his] failure to follow protocol under [his] duties and responsibilities as a Psychiatric Security Attendant; and the violation of [his] Last Chance Agreement." CP at 95. The notice of dismissal also informed Crain that his failure to assess R.K.'s wellbeing constituted misconduct and a failure to comply with DSHS policies.[3]

Crain, Parsons, and Smith filed grievances with their union. Following negotiations between the union and DSHS, Parsons's and Smith's terminations were adjusted to suspensions, and their employment was restored. The union declined to pursue Crain's grievance because it determined that DSHS provided just cause for terminating him.

Crain filed a lawsuit against DSHS for hostile work environment, disparate treatment, unlawful retaliation, and actual discharge. Crain later dismissed the hostile work environment and unlawful retaliation claims. DSHS then moved for summary judgment, arguing that Crain failed to establish a prima facie case of disparate treatment because he was unable to show that

---

[3] Crain notes that multiple non-African-American employees that were working the night of R.K.'s death were not disciplined and argues that this fact shows that DSHS was targeting African-American employees. Crain presents a strained interpretation of the record. Joseph Laureta, a Pacific-Islander registered nurse; Roberta Lopez, a Latin-American psychiatric security attendant; and Katherine Paulino, a Pacific Islander psychiatric security attendant were also on shift the evening of R.K.'s death. Laureta, Lopez, and Paulino were cleared of any misconduct after the Washington State Patrol determined, aided by video evidence, that they did not observe R.K. as he was choking on the floor and therefore did not fail to assess him or fail to follow hospital procedures.

Crain also states that Laureta, Lopez, and Paulino "stepped over R.K. as a matter of course." Br. of Appellant at 19 (emphasis omitted). This fact is simply not within the appellate record. As stated above, Laureta, Lopez, and Paulino did not observe or even walk by R.K. as he was choking on the floor, and they did not come into contact with R.K. until after Parsons began resuscitating him.

he was treated less favorably than similarly situated non-protected employees and because DSHS's decision to terminate him was supported by a legitimate and nondiscriminatory reason.

After hearing oral argument on DSHS's summary judgment motion, the trial court orally ruled that DSHS "articulated a reason for why they were terminating [Crain]" and that the stated reason was not pretextual. Verbatim Report of Proceedings (VRP) (June 17, 2016) at 16. The trial court then entered an order granting DSHS summary judgment and dismissing Crain's claims with prejudice. Crain appeals.

## ANALYSIS

Crain argues that the trial court erred in granting DSHS's motion for summary judgment because the trial court misapplied summary judgment standards relating to employment discrimination claims and that there is a genuine issue of material fact regarding whether Crain's race was a substantial factor in DSHS's decision to terminate him. We disagree.

### I. LEGAL PRINCIPLES

We review the trial court's grant of a motion for summary judgment de novo. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). When reviewing a grant of summary judgment, we consider all facts and make all reasonable, factual inferences in the light most favorable to the nonmoving party. 181 Wn.2d at 444. Summary judgment is appropriate when there is no genuine issue of material fact and the nonmoving party is entitled to judgment as a matter of law. CR 56(c).

To overcome an employer's motion for summary judgment in an employment discrimination case, an employee must show that a reasonable jury could find that the employee's protected trait was a substantial factor in motivating the employer's adverse actions.

5

*Scrivener,* 181 Wn.2d at 445. An employee's protected trait is a "substantial factor" when that protected trait was a significant motivating factor bringing about the employer's decision. 181 Wn.2d at 444. An employee may prove that his protected trait is a substantial factor by either direct or circumstantial evidence. 181 Wn.2d at 445.

If the employee does not produce direct evidence,[4] we apply the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Scrivener*, 181 Wn.2d at 446. Under the *McDonnell Douglas* analysis, the employee bears the initial burden of establishing a prima facie case of discrimination. 181 Wn.2d at 446. To establish a prima facie disparate treatment discrimination case, the employee must show that his employer treated some people less favorably than others because of their protected trait. *Alonso v. Qwest Commc'ns Co.*, 178 Wn. App. 734, 743, 315 P.3d 610 (2013). Accordingly, the employee must show that (1) he belongs to a protected class, (2) he was treated less favorably in the terms or conditions of his employment (3) than a similarly situated, nonprotected employee, and (4) he and the nonprotected "comparator" were doing substantially the same work. *Washington v. Boeing Co.*, 105 Wn. App. 1, 13, 19 P.3d 1041 (2000).

If the employee fails to establish a prima facie case of discrimination, the employer is entitled to judgment as a matter of law. *Fulton v. Dep't of Soc. & Health Servs.*, 169 Wn. App. 137, 148, 279 P.3d 500 (2012). If, however, the employee succeeds in establishing a prima facie case of discrimination, there is a rebuttable presumption of discrimination. 169 Wn. App. at 149. The burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for the

---

[4] Discriminatory statements by an employer and other "smoking gun" evidence of discriminatory motive are considered "direct evidence" that a protected trait was a substantial factor. *Fulton v. Dep't of Soc. & Health Servs.*, 169 Wn. App. 137, 148 n.17, 279 P.3d 500 (2012).

adverse employment action. *Scrivener*, 181 Wn.2d at 446. If the employer meets its burden, the employee must produce sufficient evidence that the employer's alleged nondiscriminatory reason for the adverse employment action was a pretext. 181 Wn.2d at 446. If the employee meets this burden, the discrimination case proceeds to trial unless the trial court determines that no rational fact finder could conclude that the employer's action was discriminatory. 181 Wn.2d at 446.

## II. The Trial Court's Application of Summary Judgment Standards

First, Crain argues that the trial court erred in granting DSHS's motion for summary judgment because it misapplied summary judgment standards relating to employment discrimination claims. We do not review this claim of error.

As discussed above, we review summary judgment decisions de novo. *Scrivener*, 181 Wn.2d at 444. We conduct the same inquiry as the trial court and may affirm summary judgment on any ground supported by the record. *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 144, 94 P.3d 930 (2004); *Washburn v. City of Federal Way*, 178 Wn.2d 732, 753 n.9, 310 P.3d 1275 (2013). Because we may affirm summary judgment on any ground supported by the record, we are not bound by the trial court's reasoning. Accordingly, we do not review Crain's argument that the trial court misapplied summary judgment standards. Instead, we conduct our analysis de novo.

## III. Race as a Substantial Factor

Crain argues that the trial court erred in granting DSHS's motion for summary judgment because there was a genuine issue of material fact regarding whether Crain's race was a substantial factor in DSHS's decision to terminate him. We disagree.

A.      *Direct Evidence*

Crain argues that there is direct evidence that race was a substantial factor in DSHS's decision to terminate him. Br. of Appellant at 36, 38. Specifically, Crain states:

> There is abundant direct evidence indicating that Maurice Crain did everything that he possibly knew how to do for patient R.K. at the time of his choking event, and that other non-African American employees who were immediately present and who possessed medical training but did nothing to assist were favored heavily.

Br. of Appellant at 38.

That Crain did his best to save R.K. and that others did not act is not the type of "smoking gun" evidence described in *Fulton*. Thus, it is not direct evidence that Crain's race was a substantial factor in DSHS's decision to terminate him. *See Fulton*, 169 Wn. App. at 148 n.17. Moreover, Crain does not point to any discriminatory statements made by DSHS. Accordingly, Crain does not present direct evidence of discrimination.

B.      *Circumstantial Evidence*

Because Crain does not provide direct evidence that his race was a substantial factor in motivating DSHS's decision to terminate him, Crain must establish a prima facie case of disparate treatment to overcome DSHS's motion for summary judgment. *Scrivener*, 181 Wn.2d at 445-46.

For purposes of this appeal, we assume without deciding that Crain establishes a prima facie case of disparate treatment.[5] In doing so, we note that (1) Crain is a member of a protected class, (2) DSHS terminated Crain, Parsons, and Smith following the Washington State Patrol's determination that the employees committed misconduct by failing to assess R.K. as he lay on

---

[5] However, we note that Crain's Last Chance Agreement may distinguish him from any valid comparators.

the floor choking, and (3) DSHS later restored Parsons's and Smith's employment after negotiations with their union.

C.      *Legitimate and Nondiscriminatory Reasons for Termination*

Because we assume that Crain establishes a prima facie case of disparate treatment, we presume that employment discrimination took place. *Scrivener*, 181 Wn.2d at 446. To defeat this presumption, DSHS must provide a legitimate and nondiscriminatory reason for terminating Crain. 181 Wn.2d at 446.

In its notice of dismissal, DSHS notified Crain that he was being terminated because he committed misconduct by failing to assess R.K. while he was lying on the floor, failing to follow hospital policies and procedures, and committing ethical violations. Hospital policy prohibited patients from lying on the floor and stated that patients have a right to adequate care in an environment free from neglect. Additionally, DSHS stated that Crain was terminated because he violated his Last Chance Agreement. The Last Chance Agreement provided that DSHS could terminate Crain if it determined that he committed misconduct or violated hospital procedures.

The record makes clear that Crain failed to both verbally and physically check R.K.'s wellbeing as he was choking. In addition, DSHS determined that Crain's account of the incident was inconsistent and dishonest. DSHS determined that Crain committed misconduct because he failed to check on R.K.'s wellbeing as he walked past R.K. and because he did not attempt to pick R.K. up off of the floor. Further, Crain's dishonesty was a violation of the hospital's ethics policies. Because DSHS determined that Crain committed misconduct, Crain was subject to immediate termination under the Last Chance Agreement. As a result, DSHS provides legitimate, nondiscriminatory reasons for terminating Crain.

D.    *Pretextual Reasons for Termination*

Because DSHS provides legitimate, nondiscriminatory reasons for terminating Crain, Crain must present sufficient evidence that DSHS's alleged nondiscriminatory reasons were a pretext.  181 Wn.2d at 446.  An employee can show that his employer's reasons for terminating him are pretextual by offering sufficient evidence to create a genuine issue of material fact that either (1) the employer's reason is pretextual or (2) although the employer's stated reason is legitimate, discrimination was still a substantial factor motivating the employer's adverse action.  181 Wn.2d at 446-47.  For example, an employee may show that the employer's stated reasons are pretextual by showing that the reasons have no basis in fact or were not motivating factors it considered in making its decision.  181 Wn.2d at 447-48.

Crain argues that he is not obligated to show that DSHS's stated reasons for terminating him were pretextual, and he argues only that his "exoneration" by the Department of Health and Pierce County Prosecuting Attorney's Office shows that DSHS's reasons for terminating him were pretextual.  That no disciplinary action was taken against Crain's nursing assistant license and that no criminal negligence charges were filed against him does not show that DSHS's legitimate and nondiscriminatory reasons for terminating him have no basis in fact, and it is irrelevant in determining whether these reasons were a pretext.  As a result, Crain fails to meet his burden to present sufficient evidence that creates a genuine issue of material fact that either DSHS's reasons are pretextual or that race was nevertheless a substantial factor motivating DSHS's decision to terminate him.  Accordingly, the trial court did not err in granting DSHS's motion for summary judgment.

No. 49135-4-II

We affirm summary judgment.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Johanson, J.

Bjorgen, C.J.