# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| HOLSEY SATTERWHITE, Individually, ) | No. 68763-8-I |
| ) | |
| Appellant, ) | DIVISION ONE |
| ) | |
| v. ) | |
| ) | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, ) | |
| UNIVERSITY OF WASHINGTON, ) | |
| ) | |
| Respondent. ) | FILED: October 28, 2013 |

SCHINDLER, J. — Holsey Satterwhite and his attorney Thaddeus P. Martin appeal the award of attorney fees and costs in the amount of $78,968.25 to the University of Washington under CR 11 and RCW 4.84.185. We reverse and remand.

## FACTS

Zynovia Hetherington is the Director of the Children's Welfare Teaching Assistance Program (CWTAP), a specialized three-year master's in social work degree at the University of Washington (UW).[1] Hetherington manages the program and supervises "Teaching Associates, also known as Practicum Instructors and Field Instructors." Teaching Associates instruct, train, and supervise the CWTAP graduate students.

---

[1] Hetherington is African American.

Holsey Satterwhite applied for a Teaching Associate position in May 2008. Satterwhite is an African American man with a master's degree in social work. Hetherington and several others interviewed Satterwhite and recommended hiring him for the position. In August, Dr. Margaret Spearmon, the Associate Dean of the School of Social Work, and the Dean of the School of Social Work, Edwina Uehara, appointed Satterwhite to the Teaching Associate position for the 2008 to 2009 academic year.[2]

Four of the Teaching Associates worked at the Seattle campus. Each Teaching Associate supervised between 6 and 15 CWTAP graduate students. Satterwhite was the only male instructor in the CWTAP. Satterwhite and Teaching Associate Tammy Inselman worked at the Tacoma campus. Satterwhite and Inselman conducted combined monthly or bi-monthly training sessions together.

In November 2009, Inselman told Hetherington that one of her students, Tiffany McRae, had expressed concerns about Satterwhite. Inselman said McRae said Satterwhite had asked her out on dates and "complained that the requests made her uncomfortable." Inselman also told Hetherington that during a joint training session, "Mr. Satterwhite used Ms. McRae as an example and, in doing so, he touched her shoulder."

On November 24, Hetherington met with McRae and Inselman. McRae told Hetherington that Satterwhite invited her to go to a church banquet at Fort Lewis and asked her if she wanted to go to the movies. McRae said that she wanted to attend the church event "to network in the community, particularly around people of-color issues and so this event seemed the perfect opportunity to do just that." But the request that

---

[2] Associate Dean Spearmon is African American and Dean Uehara is Japanese American.

McRae wear a dress to the event made her "uncomfortable." McRae testified, in pertinent part:

> In August 2009, I stopped by Holsey's office to ask him about the old OASIS program for African-American children. We started chatting and I told him I lived in Eatonville and he told me he lived in Graham and suggested we do something sometime as we lived near each other. He then invited me to go with him to a banquet at Ft. Lewis that was related to some of his church activities. I work for the Pierce County AIDS Foundation and one of my tasks is to network in the community, particularly around people of-color issues and so this event seemed the perfect opportunity to do just that. I did not perceive any problem with attending this event with Holsey. I told him of my professional interests and so I took our going to the banquet as a professional event; I also assumed he knew where I worked. What made me uncomfortable about going with Holsey to this event was his mentioning to me that I should wear a dress. He explained that the banquet was a formal affair and so he wanted me to wear a dress. A couple of weeks later, I realized that I would have to work the day of the banquet and texted him a message (we had exchanged phone numbers) telling him I could not make it.

McRae also described the training session where Satterwhite used her "in an example for a social work case and pointed his finger into my shoulder to make a point." McRae said she did not "mind him using me in his example" but "did not like being touched."

On November 25, Hetherington and Associate Dean Spearmon met with Satterwhite. Satterwhite said that after a discussion with McRae about race, he invited her to go to a church event. Satterwhite said that he told McRae she should wear a dress to the church event because "[i]t's a traditional black church. [T]he guys wear black suits or tuxedos and the women wear black dresses." Satterwhite testified, in pertinent part:

> [McRae] came up to me and she just struck up a conversation.
> And what she said, she was like -- because we were talking about something, that there was race in the context of black and white,

3

and that's when she brought it up. She said, I live in Eatonville and there isn't a lot of black people that live up there.

I said, I live in Graham. I said, There's not a lot of black people over there either.

She was asking, Well, what do you do?

I said, Well, I have my church, I have several organizations I belong to, that, you know, I know other blacks.

And so she -- I told her then, I said -- my pastor and his wife's anniversary is coming up. I said, You are welcome to go if you want, I can get you a ticket. I said, And you can go. I said, I will introduce you to other people there. I said, It's a traditional black church, just so you know, so that means that men wear their black suits and women their black dresses.

She said she had a son, who I think was seven years old.

I told her, I said, Well, my lady friend, the lady I was seeing at the time, I said, She has a son about the same age. I said, I'll introduce you to her, you guys can talk. I said, She can probably take you around, if you would like, and introduce you.

I said, My fraternity, we have outings, family outings every year. I said, the Masonics that I belong to -- I said, So I can at least get you there and introduce you and you can take it from there.

She was like, Oh, okay, okay, okay.

I'm like, You can go from there. I said, That will help you out.

She goes, Okay.

I do remember that conversation.

Q    What did she say in response?

A    She said, Okay, that would be nice.

Q    Okay.
     She didn't seem uncomfortable with it at all?

A    No, absolutely not.

Satterwhite denied asking McRae on a date but admitted touching her on the shoulder during a training exercise. Satterwhite testified, in pertinent part:

I'm like, How was that asking her on a date? Because I told her, When I was telling her specifically about the banquet, I said I'll introduce you to my lady friend, and you can meet her and y'all can talk. I'll introduce you to as many black people as you want to and you can go from there.

I failed to see that I was asking her on any type of date, if you want to add the caveat of it being any type of romantic-type situation. I was explaining that to her.

4

Satterwhite said that he invited McRae to attend the banquet to help her network. Satterwhite expressed his concern that Hetherington and Associate Dean Spearmon were using a double standard.

> No one says anything when the females, you know, go out to eat and socialize after class and stuff like that. Why is it different for me? And I never got a response.
> And so I'm like, that's a -- that's a double standard. That -- that makes it look like, oh, well, this man is coming on. I'm not coming on to her. I had no intention, nor do I have now, or any type of romantic stuff with this woman. Why is there a double standard, that if I do the same thing that I seen them, including my director do, then why is it a problem, but it wasn't a problem for them?

Associate Dean Spearmon told Satterwhite that she planned to meet with McRae and that he "could have the University-wide ombudsman . . . if [he] wanted to. But [Associate Dean Spearmon] said, [she would] rather if we handled this here with us." Satterwhite also testified that Associate Dean Spearmon assured him that "[t]his is low level. . . . We'll get this settled as quick" as possible.

> [Associate Dean Spearmon] said -- yeah, she said something like -- because I'm like, Well, what does this mean?
> And she said, Well, um, um, um, you're okay, you won't, you know, lose your job. She says, I've seen cases much worse than this, she says, So you'll be okay. She said, This is low level. She said, This is low level.

In late November, Associate Dean Spearmon, Director Hetherington, and CWTAP Associate Director Carol Donaldson met with McRae. McRae said that she did not want to see Satterwhite again and "felt sexually harassed." After the meeting, Associate Dean Spearmon and Dean Uehara concluded that McRae had alleged Satterwhite violated UW policies, "including those prohibiting sexual harassment."

On December 8, Associate Dean Spearmon and Dean Uehara met with Satterwhite. Associate Dean Spearmon told Satterwhite that McRae complained that

"he had asked Ms. McRae at attend a formal social gathering at which she was to wear a dress," touched her shoulder during training, and "inquired into her personal life." Associate Dean Spearmon explained that under the Faculty Code, the options were "initiation of proceedings with the University's Ombudsman's Office, investigation of the allegations by the University Complaint and Resolution Office (UCIRO), or an agreed resolution." According to Associate Dean Spearmon, Satterwhite "did not want a formal investigation or to involve the University Ombudsman's Office, but that he instead wanted to try and resolve the matter directly."

After the meeting, Associate Dean Spearmon and Dean Uehara asked Hetherington "to look into other CWTAP duties Mr. Satterwhite could perform through the end of his appointment (June 30, 2010) where he would not have any more one-on-one contact with students, including Ms. McRae."

On December 17, Associate Dean Spearmon sent Satterwhite a letter describing the agreement to modify his appointment and reduce his position to 80 percent. The letter states, in pertinent part:

> [T]his letter is to confirm our mutual agreement regarding modifications to your current appointment as a Teaching Associate with the University of Washington School of Social Work. As you and I discussed, most recently on December 15, 2009, these modifications will take effect on January 4, 2010. It is agreed and understood that your appointment with the School of Social Work will end no later than June 30, 2010, subject to satisfactory performance, and it will not be renewed.

Associate Dean Spearmon requested Satterwhite sign the letter "to signify your voluntary agreement with all of the above terms." On January 28, 2010, Satterwhite signed and returned the letter.

6

After Satterwhite's appointment ended in 2010, the CWTAP hired an African American woman to fill the Teaching Associate position.

On January 31, 2011, Satterwhite filed a lawsuit against the UW alleging discrimination, hostile work environment, wrongful discharge, retaliation, negligent infliction of emotional distress, negligent hiring, negligent retention, negligent supervision, intentional infliction of emotional distress, assault, and battery.

After the UW received responses to interrogatories and requests for production, the UW attorney sent an e-mail to Satterwhite's attorney Thaddeus P. Martin. The UW attorney asked Martin to dismiss the lawsuit because "this case is frivolous and advanced without reasonable cause." The e-mail pointed out that Satterwhite expressly agreed to "modifications to his job and to the termination of his appointment," and his race discrimination claim was "factually unsupportable." The UW attorney also noted that Satterwhite admitted "in his discovery responses that he did not engage in any protected activity, that he was not assaulted or subject to battery by any University employee." The e-mail states that "should we need to depose the Plaintiff, I intend to thereafter file a motion for summary judgment and seek recovery of the University's fees and costs."

Satterwhite agreed to dismiss the claims for intentional infliction of emotional distress, assault, and battery with prejudice. On May 17, the parties filed an agreed order of dismissal of those claims. Satterwhite did not agree to dismiss the other claims.

The UW deposed Satterwhite. Satterwhite testified that he was discriminated against based on race and gender. Satterwhite said, "I was a male in -- the only male,

7

actually, in this female situation. I had brought those concerns to Ms. Hetherington on numerous occasions." Satterwhite testified, "I would say, You guys can talk because you can relate, you can say things that I can't relate to. I can't be a part of the conversation, because if I say something, it might be construed that I'm being inappropriate." Satterwhite also testified that at one training event, a coworker made an offensive racial comment about him. "We were at someplace over by the UW . . . . Who was that that was saying, Well, you know how y'all black men are. I didn't say anything . . . . But I took offense to that."

Satterwhite testified that Associate Dean Spearmon told him he would not lose his job and that "[t]his is low level." Satterwhite said that when he received the letter, he tried to get in touch with Associate Dean Spearmon and Hetherington "to try to find out what was going on." Satterwhite testified that he "did not know that I was actually losing my job until I got [the] letter" from Associate Dean Spearmon. Satterwhite also testified that he signed the agreement under duress.

> Q  If you are saying that you had not discussed these issues before receiving the letter with [Associate Dean Spearmon] or [Hetherington], why would you sign the letter?
> A  I needed a job, and it was signed under duress. I needed a job. I did not have a job.

During her deposition, Director Hetherington testified that she suggested transferring Satterwhite to the six-month nonrenewable position "[b]ecause I wanted him to have a job." Hetherington said that the new position was based on McRae's allegations that "she felt sexually harassed" by Satterwhite.

Associate Dean Spearmon testified that she had no issues with Satterwhite's performance as an instructor. Associate Dean Spearmon said that Satterwhite was

8

removed from his position because McRae "reported feeling sexually harassed."

The UW filed a motion for summary judgment dismissal of the discrimination, hostile work environment, retaliation, wrongful discharge, and negligence claims. The UW argued Satterwhite could not establish a prima facie case of race or gender discrimination because "there is no evidence that the University's legitimate reason for not renewing his appointment—inappropriate conduct with a University student—was a pretext for discrimination." The UW also argued there was no evidence Satterwhite was subjected to a hostile work environment. The UW submitted a number of declarations in support of summary judgment, including the declaration of Director Hetherington, McRae, Associate Dean Spearmon, and Dean Uehara.

In his response to the summary judgment motion, Satterwhite agreed to dismiss the negligence claims but opposed dismissal of his discrimination and wrongful discharge claims. Satterwhite asserted the evidence established a prima facie case of race and gender discrimination, hostile work environment, and wrongful discharge. Satterwhite submitted excerpts from his deposition and the depositions of Director Hetherington, Associate Dean Spearmon, and Dean Uehara.

The court granted the motion for summary judgment dismissal of the claims with prejudice. As to the discrimination claims, the court concluded Satterwhite did not present any evidence of pretext. In the oral ruling, the court states, in pertinent part:

> Even if the prima facie case was made out by the plaintiff, which the Court believes it was not done, there is no evidence that the university's actions taken or explanations given, were pretextual. It appears from the evidence that the university's acts were based upon legitimate considerations that were not motivated in any way by racial or gender discrimination.

9

As to the hostile work environment claim, the court acknowledged Satterwhite presented evidence of offensive remarks but concluded "it certainly didn't amount to what's required to constitute a hostile work environment."

The court ruled that "considering all the evidence" presented at summary judgment, the claims "appear to be frivolous." On March 9, 2012, the court entered an order granting the motion for summary judgment and dismissing the lawsuit against the UW with prejudice.

Approximately one month later, the UW filed a motion for an award of attorney fees and costs against Satterwhite and his attorney under CR 11 and RCW 4.84.185. The UW requested all of the attorney fees and costs incurred from the date of filing the complaint through the date for the summary judgment motion, totaling $73,609 in attorney fees and $4,609.25 in costs.

Except for deducting $750 related to "excess and apparent duplication," the court awarded all of the attorney fees and costs requested by the UW under CR 11 and RCW 4.84.185. The court ordered Satterwhite and his attorney to pay a total of $78,968.25 as "the reasonable fees and costs incurred by the Defendant University of Washington in defending this suit."[3]

---

[3] The order states, in pertinent part:

The fees and costs are calculated as follows:

| | |
|---|---|
| Fees Through April 6, 2012 — | $73,609.00 |
| deduct some excess and apparent duplication — | 750.00 |
| Subtotal | $72,859.00 |
| Costs . . . . . . . . . . . . . . . . . . . . . | 4,609.25 |
| | $77,468.25 |
| Fees related to Defendant's Reply Memorandum re Attorneys' fees . . . . . . . . . . . | $1,500.00 |
| Total Fees and Costs | $78,968.25 |

The court entered a judgment of $78,968.25 against Satterwhite and Martin jointly and severally for "the sum of the reasonable number of hours expended by the University in defending against this frivolous action at reasonable hourly rates, plus necessary costs."

ANALYSIS

Satterwhite and Martin contend the court erred in awarding attorney fees and costs under CR 11 and RCW 4.84.185 and in entering the judgment for $78,968.25. Satterwhite and Martin contend the court abused its discretion by failing to enter findings identifying the sanctionable conduct, and concluding the discrimination claims lacked a factual or legal basis and were advanced without reasonable cause.[4] Satterwhite also contends the court did not limit the amount of fees awarded to the amount reasonably expended in responding to sanctionable conduct under CR 11.

CR 11 Sanctions

The decision to impose sanctions under CR 11 is within the sound discretion of the trial court. State ex rel. Quick-Ruben v. Verharen, 136 Wn.2d 888, 903, 969 P.2d 64 (1998). A court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. MacDonald v. Korum Ford, 80 Wn. App. 877, 884, 912 P.2d 1052 (1996). Applying the wrong legal standard is an abuse of discretion. Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006).

"The purpose behind CR 11 is to deter baseless filings and curb abuses of the judicial system." Bryant v. Joseph Tree, Inc., 119 Wn.2d 210, 219, 829 P.2d 1099 (1992). "CR 11 is not meant to act as a fee shifting mechanism, but rather as a

---

[4] While Satterwhite assigned error to the trial court findings that all of Satterwhite's claims were frivolous and brought without reasonable inquiry, Satterwhite addresses only the discrimination and wrongful discharge claims.

11

deterrent to frivolous pleadings." Korum Ford, 80 Wn. App. at 891. Civil Rule 11 addresses two types of problems: (1) filings that are not grounded in fact and warranted by law and (2) filings interposed for an improper purpose. Bryant, 119 Wn.2d at 217.[5] Because CR 11 sanctions may have a chilling effect, the court should impose CR 11 sanctions "only when it is patently clear that a claim has absolutely no chance of success." Skimming v. Boxer, 119 Wn. App. 748, 755, 82 P.3d 707 (2004).

Preliminarily, Satterwhite and Martin assert the court erred in failing to identify the sanctionable conduct. The record does not support their assertion. The record shows that the court complied with the requirements of Biggs v. Vail, 124 Wn.2d 193, 876 P.2d 448 (1994) (Biggs II), by identifying the sanctionable conduct by finding that the claims were not grounded in fact or law. In Biggs II, the Court held, in pertinent part:

> [I]n imposing CR 11 sanctions, it is incumbent upon the court to specify the sanctionable conduct in its order. The court must make a finding that either the claim is not grounded in fact or law and the attorney or party failed to make a reasonable inquiry into the law or facts, or the paper was filed for an improper purpose.

Biggs II, 124 Wn.2d at 201.

---

[5] CR 11(a) provides, in pertinent part:

Every pleading, motion, and legal memorandum of a party represented by an attorney shall be dated and signed . . . . The signature of . . . an attorney constitutes a certificate by the . . . attorney that the party or attorney has read the pleading, motion, or legal memorandum, and that to the best of the party's or attorney's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is well grounded in fact; (2) it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Satterwhite and Martin contend the court abused its discretion in finding the discrimination claims were not grounded in fact and law when the complaint was filed.[6] We agree.

A court may not impose CR 11 sanctions for filing baseless claims unless it "finds that the attorney who signed and filed the complaint failed to conduct a <u>reasonable inquiry</u> into the factual and legal bases of the claim." Bryant, 119 Wn.2d at 220.[7] In making that determination, we use an objective standard to determine whether "a reasonable attorney in like circumstances could believe his or her actions to be factually and legally justified." Bryant, 119 Wn.2d at 220. The court must also consider "the need for discovery to develop factual circumstances underlying a claim." Bryant, 119 Wn.2d at 220-21.[8] Courts should be "reluctant to impose sanctions . . . before there has been an opportunity for discovery" because the notice pleading rule "contemplates that discovery will provide parties with the opportunity to learn more detailed information about the nature of a complaint." Bryant, 119 Wn.2d at 222. The fact that a complaint "does not prevail on its merits is by no means dispositive of the question of CR 11 sanctions." Bryant, 119 Wn.2d at 220. "To avoid being swayed by the benefit of hindsight, the trial court should impose sanctions only when it is 'patently clear that a claim has absolutely no chance of success.' " Korum Ford, 80 Wn. App. at 884 (quoting Oliveri v. Thompson, 803 F.2d 1265, 1275 (2nd Cir.1986)).

---

[6] The order states, in pertinent part:

    1.     Plaintiff Holsey Satterwhite's claims in this case were not grounded in fact or law, are frivolous, and were advanced without reasonable cause under RCW 4.84.185;

    2.     Plaintiff's counsel Thaddeus Martin failed to make a reasonable inquiry into the law and facts with respect to Plaintiff's claims in this case as required by CR 11.

[7] (Emphasis in original.)

[8] (Citation omitted.)

13

In the complaint, Satterwhite alleged race and gender discrimination in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. A plaintiff may allege discrimination based on both race and gender. See e.g., Harris v. Maricopa County Superior Court, 631 F.3d 963, 976-77 (9th Cir. 2011) (African American man's claim that "false sexual harassment allegations were made against him and that action was taken on these false charges because of the combination of his race and gender" was "perfectly plausible.").[9]

"The burden of establishing a prima facie case of disparate treatment is not onerous." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). "The 'requisite degree of proof necessary to establish a prima facie case . . . is minimal and does not even need to rise to the level of a preponderance of the evidence.' " Fulton v. Dep't of Social & Health Svcs., 169 Wn. App. 137, 152, 279 P.3d 500 (2012)[10] (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.1994)).

To establish a prima facie case of discrimination, Satterwhite must show (1) he belongs to a protected class, (2) he was treated less favorably in the terms or conditions of his employment than similarly situated employees, and (3) he engaged in substantially similar work as nonprotected class employees. Domingo v. Boeing Emps.' Credit Union, 124 Wn. App. 71, 81, 98 P.3d 1222 (2004).[11]

---

[9] Because WLAD is patterned after Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000a, Washington courts rely on federal decisions interpreting Title VII to decide issues under WLAD. See e.g., Oliver v. Pac. Nw. Bell Tel. Co., 106 Wn.2d 675, 678, 724 P.2d 1003 (1986); Haubry v. Snow, 106 Wn. App. 666, 674 n.7, 31 P.3d 1186 (2001).

[10] (Alteration in original) (emphasis in original).

[11] The elements for a prima facie case are not absolute but vary based on the relevant facts. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 363, 753 P.2d 517 (1988).

To establish a prima facie case of hostile work environment, Satterwhite had the burden of showing (1) the harassment was unwelcome, (2) the harassment was because of his race or gender, (3) the harassment affected the terms or conditions of employment, and (4) the harassment is imputed to the employer. Estevez v. Faculty Club of the Univ. of Wash., 129 Wn. App. 774, 794, 120 P.3d 579 (2005). To meet the third hostile work environment element, Satterwhite must establish that the harassment was "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." Glasgow v. Georgia-Pac. Corp., 103 Wn.2d 401, 406, 693 P.2d 708 (1985).

Once the plaintiff presents a prima facie case, a presumption of discrimination exists and the employer must produce evidence of legitimate, nondiscriminatory reasons for its actions. Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 363-64, 753 P.2d 517 (1988). If the defense meets this burden, the plaintiff must show that the employer's stated reasons are pretextual. Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 182, 23 P.3d 440 (2001), overruled on other grounds by McClarty v. Totem Elec., 157 Wn.2d 214, 137 P.3d 844 (2006).

In order to show that an employer's stated rationale for an employment decision was pretextual, in other words, "unworthy of belief," the plaintiff must produce evidence from which a trier of fact could infer that the employer's "articulated reasons" for the employment decision "(1) have no basis in fact, (2) were not really motivating factors for the decision, or (3) were not motivating factors in employment decisions for other employees in the same circumstances." Kirby v. City of Tacoma, 124 Wn. App. 454, 467, 98 P.3d 827 (2004). It is well established that a plaintiff need not "produce 'direct

evidence of discriminatory intent.' " Hill, 144 Wn.2d at 179 (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 n.3, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)). " 'Circumstantial, indirect and inferential evidence will suffice to discharge the plaintiff's burden.' " Hill, 144 Wn.2d at 179-80 (quoting Sellsted v. Wash. Mut. Sav. Bank, 69 Wn. App. 852, 860, 851 P.2d 716 (1993)).[12]

The record establishes a factual and legal basis to file the discrimination claims. Satterwhite is African American and was the only male in the CWTAP. Satterwhite testified that he was treated differently based on both race and gender. Satterwhite testified that Hetherington and the CWTAP Associate Director scrutinized his work more closely than the white female who held the same position as Satterwhite. Satterwhite also testified that he was treated differently by Associate Dean Spearmon and Dean Uehara in evaluating the allegations of McRae because of his race and gender. In addition, Satterwhite testified that he was discriminated against by his coworkers, with one of his coworkers making the comment, "[Y]ou know how y'all black men are."

Further, while the UW argues that Satterwhite's resignation was voluntary, the presumption that resignation is voluntary can be rebutted "by showing the resignation was prompted by duress or an employer's oppressive actions." Townsend v. Walla Walla Sch. Dist., 147 Wn. App. 620, 627-28, 196 P.3d 748 (2008). Satterwhite testified that he did not know that he would lose his job until he received the letter from Associate Dean Spearmon and that he signed the agreement under duress.

---

[12] We note that pretext is typically a question of fact. Fell v. Spokane Transit Auth., 128 Wn.2d 618, 643, 644, 911 P.2d 1319 (1996) (reversing summary judgment, noting pretext is usually a question of fact and that on remand, plaintiffs "will have the opportunity . . . to conduct appropriate discovery" to prove pretext).

We conclude that when Satterwhite filed his lawsuit it was reasonable to believe he had meritorious claims for discrimination and unlawful discharge. But in opposition to summary judgment dismissal of his discrimination claims, Satterwhite presented no evidence to rebut the legitimate nondiscriminatory reasons presented by the UW.[13] On remand, the court should determine whether at some point following discovery and before summary judgment Satterwhite and Martin knew or should have known that the facts and law did not justify continuing to pursue these claims.

Where the CR 11 " 'sanctions imposed are substantial in amount, type, or effect, appellate review of such awards will be inherently more rigorous; such sanctions must be quantifiable with some precision.' " Korum Ford, 80 Wn. App. at 892 (quoting Thomas v. Capital Sec. Servs., Inc., 836 F.2d 866, 883 (5th Cir. 1988)). Under CR 11, the court must limit an award of attorney fees to " 'the amounts reasonably expended in responding to the sanctionable filings.' " Korum Ford, 80 Wn. App. at 891 (quoting Biggs II, 124 Wn.2d at 201). The court should also impose the least severe sanction necessary. Miller v. Badgley, 51 Wn. App. 285, 303-04, 753 P.2d 530 (1988). CR 11 should not be used as a fee shifting mechanism. Bryant, 119 Wn.2d at 220. In addition, where a party voluntarily dismisses a baseless claim, "such corrective action should be used to mitigate the amount of sanction imposed." Biggs II, 124 Wn.2d at 199-200.

---

[13] The UW argues that Satterwhite presented no evidence to rebut the same actor inference. Hill, 144 Wn.2d at 189 (emphasis in original) (noting that when an employee is both hired and fired by the same decision makers "within a relatively short period of time, there is a strong inference that he or she was not discharged because of any attribute the decision makers were aware of at the time of hiring"). Satterwhite's failure to overcome an inference at summary judgment is not dispositive of whether the court properly imposed sanctions for filing the claim.

The award of attorney fees and costs in this case is not limited to the least severe sanction necessary and is not limited to the amounts reasonably expended in responding to sanctionable conduct. Except for $750 of the amount the UW requested, the court awarded all of the attorney fees and costs incurred by the UW, totaling $78,968.25. On remand, the court shall determine the amount of fees reasonably expended, taking into consideration dismissal of claims and the least severe sanction.

RCW 4.84.185

Satterwhite and Martin contend the court erred in imposing sanctions under RCW 4.84.185 because the discrimination and wrongful discharge claims were not frivolous.[14]

RCW 4.84.185 allows for recovery of attorney fees and costs by the prevailing party where the lawsuit is found to be "frivolous."[15] Generally, a lawsuit or an appeal is frivolous when it cannot be supported by any rational argument on the law or facts, or " 'if there are no debatable issues upon which reasonable minds might differ and it is . . . totally devoid of merit.' " Quick-Ruben, 136 Wn.2d at 905 (quoting Presidential Estates Apartment Assocs. v. Barrett, 129 Wn.2d 320, 330, 917 P.2d 100 (1996)). Under RCW 4.84.185, "[t]he lawsuit, as a whole, that is in its entirety, must be determined to be frivolous and to have been advanced without reasonable cause." Biggs v. Vail, 119 Wn.2d 129, 137, 830 P.2d 350 (1992). Because the discrimination and wrongful

---

[14] Satterwhite and Martin also argue that the court may not award fees under RCW 4.84.185 unless the lawsuit was frivolous and "interposed for purposes of delay, nuisance, spite, or harassment." The text of the statute contains no such requirement. Highland Sch. Dist. No. 203 v. Racy, 149 Wn. App. 307, 311, 202 P.3d 1024 (2009) (acknowledging legislative history but holding, "Nothing in the statute requires a court to find that the action was brought in bad faith or for purposes of delay or harassment").

[15] RCW 4.84.185 provides, in pertinent part:

[U]pon written findings by the judge that the action, counterclaim, cross-claim, third party claim, or defense was frivolous and advanced without reasonable cause, [the court may] require the nonprevailing party to pay the prevailing party the reasonable expenses, including fees of attorneys, incurred in opposing such action, counterclaim, cross-claim, third party claim, or defense.

discharge claims were not "frivolous and advanced without reasonable cause," the court abused its discretion in awarding attorney fees and costs under RCW 4.84.185.

We vacate the judgment and remand to reconsider the award of attorney fees and costs under CR 11.[16]

WE CONCUR:

---
[16] We deny the UW's request for fees under RAP 18.9(a). Satterwhite's appeal is not frivolous because it presents issues upon which reasonable minds might differ. Reid v. Dalton, 124 Wn. App. 113, 128, 100 P.3d 349 (2004) (quoting Fay v. Nw. Airlines, Inc., 115 Wn.2d 194, 200-01, 796 P.2d 412 (1990)) (" 'An appeal is frivolous if there are no debatable issues upon which reasonable minds might differ and it is so totally devoid of merit that there was no reasonable possibility of reversal.' ")