# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THOMAS E. BITTNER,<br><br>              Appellant,<br><br>          v.<br><br>SYMETRA NATIONAL LIFE INSURANCE COMPANY, and JEREMY FREESTONE, an individual,<br><br>              Respondents. | No. 85708-8-1<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

FELDMAN, J. — Thomas Bittner sued his former employer, Symetra Life Insurance Company (Symetra), and its Senior Vice President, Jeremy Freestone, alleging several violations of the Washington Law Against Discrimination (WLAD), including retaliation and disability discrimination, as well as various contractual and wage claims. The trial court dismissed Bittner's WLAD claims on summary judgment, and a jury later returned a defense verdict on Bittner's remaining claims that proceeded to trial. Bittner appeals the trial court's dismissal on summary judgment of his WLAD claims, judgment on the jury verdict, and award of costs to Symetra. We reverse the trial court's dismissal of Bittner's retaliation claims and remand for further proceedings on those claims. We also vacate the trial court's cost award. In all other respects, we affirm.

I

A.    Factual background[1]

In 2010, Symetra hired Bittner as a Regional Vice President (RVP) of Sales. In this role, Bittner supervised a team of sales representatives who sold stop loss insurance policies. From 2014 onward, Bittner's sales team consistently exceeded its annual sales quota. In 2015, Symetra promoted Bittner and expanded his sales territory.

In October 2014, one of Bittner's sales representatives, Deborah Rotz, informed him that the company's Vice President of Underwriting, David Manning, had sexually harassed and verbally abused her. Bittner reported Manning's conduct to Symetra Human Resources (HR) and encouraged Rotz to do the same, which she did. In response, an HR representative advised Rotz to "contact Dave Manning or work it out herself," and Manning, in turn, accused Rotz of acting improperly during a sale. When Rotz told Bittner how Symetra had responded to her complaint, Bitter told her, "[Y]ou need to get legal advice. This isn't right." Symetra fired Rotz in February 2015, and she then sued Symetra alleging, among other claims, that it unlawfully harassed and discriminated against her on the basis of gender. Rotz and Symetra settled this lawsuit in 2016.

---

[1] Because the principal issue in this appeal is whether the trial court erred in granting in part Symetra's motion for summary judgment, the facts herein are set forth in the light most favorable to Bittner, the non-moving party, based on the evidence submitted on summary judgment. *See Blue Diamond Grp., Inc. v. KB Seattle 1, Inc.*, 163 Wn. App. 449, 453, 266 P.3d 881 (2011).

A similar incident occurred with a Symetra Regional Sales Executive, Jane Doe.[2]  In 2014, Doe confided in Bittner that her manager, Chris Koettker, was sexually harassing her.  As he did with Rotz, Bittner reported the behavior to HR and encouraged Doe to do the same, which she did.  Symetra did not investigate Doe's complaints, and Symetra's Executive Vice President, Michael Fry, told Bittner to "take [his] nose out of other managers' business and to mind the matters in [his] own division."  When Doe expressed her frustration with Symetra's failure to respond meaningfully to her complaint, Bittner told her she should "seek legal advice and find out what she can do."  Doe subsequently left Symetra and then sent a demand letter to the company accusing it of subjecting her to sexual harassment and discrimination.  Symetra conducted an internal investigation of Doe's claims, resolved them via a settlement agreement with Doe, and fired Koettker.

Bittner's superiors disapproved of him telling other Symetra employees to seek legal advice, and they told him so.  In September 2017, a senior partner in HR, Jeffrey Ward, e-mailed Fry:

> I believe that [Doe] and Tom [Bittner] communicate with each other and we know that Tom has given some bad advice to employees in the past who are feel[ing] disgruntled with Symetra, e.g. you should seek legal advice.
>
> My concern is that he will do the same with [Doe].  Should we be concerned about that?  If so, would you like me to reach out to Tom? Would you prefer to offer that coaching to him?

---

[2] "Jane Doe" is a pseudonym.

In July 2018, after Symetra settled with Doe, Ward again e-mailed Fry suggesting that he instruct Bittner in an upcoming meeting:

> Stop: . . . [a]dvising employees to seek legal advice.  You represent the company.  It's not your place to tell any Symetra employee to seek legal advice, e.g. D. Rotz.

Ward also recommended that Fry tell Bittner:

> Start:  .  .  .  [u]nderstanding the significant difference between sympathy and empathy.  .  .  .  [Y]ou certainly shouldn't advise [employees] to seek legal advice. . . . [U]nless they are your direct employee, you cannot advise them but rather guide them to working with their management team and/or aligned HR.

Following the meeting, Fry wrote a letter to Bittner that "outline[d] additional areas that we discussed today where your performance as a sales leader in the Benefits Division needs to improve."  Under a section entitled "Behavior That Must Stop Immediately," Fry listed,

1. Behaving impulsively and adding your commentary when it may not be warranted or advisable.  Know when to listen and keep quiet.
2. Advising employees to seek legal advice.

According to Bittner, Fry made it clear to him that "if I did this again, I would be fired."  Bittner also recalls that his direct supervisor, Tom Costello, "told me pretty much I was going to get fired if I did it again."

The day after Fry's July 2018 meeting with Bittner, Costello began documenting a list of performance issues with Bittner that would later "factor[] into" Symetra's decision to terminate him.  Bittner soon began noticing "intense scrutiny over just everything I did."  Bittner recalled that "I couldn't be doing enough. . . . [O]nce I hit goals they wanted me to hit, they asked me to do something different."

In February 2019, Bittner's new skip-level manager, Freestone, put Bittner on a 60-day performance improvement plan (PIP) and told him that his "position is in jeopardy" if he did not meet certain expectations relating to managing his sales team, monitoring his sales metrics, and building his professional relationships.

Around this same time, Bittner's managers were pressuring him to fire the oldest member of his sales team, Chuck Jaggers. Freestone told Bittner that the company "wanted to get younger members on the team in order to get more production out of the market." In early October 2019, Freestone and Costello instructed Bittner to put Jaggers on a PIP and urge Jaggers to retire. Symetra executives also moved a younger employee from Costello's team to Bittner's team and shifted customers away from Jaggers and to the younger employee. In response, Bittner e-mailed Costello, "Not . . . sure what I am to do further with my oldest rep who has hit his goals? . . . I will put him on notice if that is what you want. I just don't think it is right and would need to navigate properly to avoid any view of discrimination against myself or Chuck." Bittner told Jaggers privately that he opposed Symetra's efforts to "manag[e] him out" and that Jaggers should seek legal advice because "if something happens to me, I hope you know your rights." Bittner also voiced his concerns during a phone call with Ward that Jaggers was being subjected to age discrimination.

In early October 2019, Freestone, Costello, and Ward decided to terminate Bittner's employment with Symetra at a scheduled phone call on October 17. On October 15, Bittner submitted, and Symetra approved, a request for a medical

leave of absence under the Family and Medical Leave Act (FMLA).[3]  When Bittner did not attend the phone call the following morning, Ward initiated Bittner's termination paperwork, but he later "pulled the term[ination] back" when he learned that Bittner had taken a leave of absence.  While Bittner was on leave, Ward cut off Bittner's access to Symetra's systems "because we were going to terminate his employment," and Symetra executives placed another employee, Sean Cooley, in Bittner's position on an interim basis.

On January 3, 2020, Symetra learned that Bittner's doctor had cleared him to return to work on February 14.  But on January 13, shortly after Bittner's FMLA leave expired, Symetra informed Bittner that it was "exercising our right to fill your position and/or restructure the role" and placed Cooley into Bittner's position permanently.  Symetra classified Bittner as an "employee without position" and told him he could apply for another position within Symetra.  On February 18, 2020, Bittner accepted a position at another company, and he began working there in March.  After learning Bittner had accepted this other position, Symetra considered Bittner to have resigned from Symetra effective March 31, 2020.

B.     Procedural history

Bittner sued Symetra and Freestone alleging (1) retaliation in violation of the WLAD, (2) "failure to accommodate and enter into the interactive process in violation of the WLAD," (3) breach of express unilateral contract, (4) breach of implied-in-fact contract, (5) willful withholding of wages in violation of RCW 49.48

---

[3] 29 U.S.C. § 2601.

and RCW 49.52.070, (6) breach of unilateral contract, (7) unjust enrichment, and (8) "disability discrimination in violation of the WLAD."  (Emphasis omitted).

Both parties moved for summary judgment.  Bittner's motion for partial summary judgment asked the trial court to (a) rule as a matter of law "that encouraging an employee to consult with a lawyer to better understand her right to be free from workplace discrimination is . . . protected opposition activity under RCW 49.60.210," and (b) dismiss nine of Symetra's affirmative defenses.  Symetra's motion sought dismissal of all of Bittner's claims.  At a hearing on the parties' summary judgment motions, the trial court denied Bittner's motion, granted Symetra's motion with respect to Bittner's WLAD claims and dismissed them, and denied Symetra's motion with respect to Bittner's remaining claims.  After the hearing, the trial court issued written orders memorializing its oral rulings.[4]

The case proceeded to trial, and the jury did not find Symetra liable on any claims.  The trial court awarded costs to Symetra as the prevailing party.  Bittner appeals.

II

Bittner argues the trial court erroneously dismissed his retaliation claims on summary judgment.  We agree.

A.    Statutory framework and standard of review

The WLAD prohibits discrimination in employment on the basis of sex, age, disability, and other protected characteristics.  RCW 49.60.030.  To accomplish

---

[4] The order granting in part Symetra's motion for summary judgment also dismissed Freestone as a defendant because the only claim asserted against him was Bittner's retaliation claim.

- 7 -

the act's purpose of eliminating and preventing discrimination, the legislature has directed Washington courts to liberally construe the WLAD's provisions. RCW 49.60.010; RCW 49.60.020. "[A] plaintiff bringing a discrimination case in Washington assumes the role of a private attorney general, vindicating a policy of the highest priority." *Jin Zhu v. N. Cent. Educ. Serv. Dist.-ESD 171*, 189 Wn.2d 607, 614, 404 P.3d 504 (2017) (quoting *Marquis v. City of Spokane*, 130 Wn.2d 97, 109, 922 P.2d 43 (1996)).

The WLAD also prohibits employers from retaliating against persons who oppose discriminatory practices prohibited by the act. The act makes it unlawful for an employer to "discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter." RCW 49.60.210(1). "It is well recognized that WLAD . . . relies heavily on private individuals for its enforcement. This reliance would be unrealistic, to say the least, 'if this court does not provide them some measure of protection against retaliation.'" *Jin Zhu*, 189 Wn.2d at 622-23 (quoting *Allison v. Housing Auth.*, 118 Wn.2d 79, 94, 821 P.2d 34 (1991)). A WLAD retaliation claim has three elements: "(1) the employee took a statutorily protected action, (2) the employee suffered an adverse employment action, and (3) a causal link between the employee's protected activity and the adverse employment action." *Cornwell v. Microsoft Corp.*, 192 Wn.2d 403, 411, 430 P.3d 229 (2018).

Courts have recognized two methods of proving these elements. The first is the widely recognized three-step *McDonnell Douglas* burden-shifting framework.

*Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 571, 459 P.3d 371 (2020).[5]

"Because direct evidence of discriminatory intent is rare," we employ the *McDonnell Douglas* test where an employee can only produce "'circumstantial, indirect, and inferential evidence to establish discriminatory action.'" *Id.* (quoting *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittias County*, 189 Wn.2d 516, 526, 404 P.3d 464 (2017)). First, the employee must produce sufficient circumstantial evidence to establish a prima facie case of retaliation.[6] *Id.* Second, if the employee makes this showing, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for the employment decision. *Id.* Third, if the employer meets their burden, the employee must produce sufficient circumstantial evidence showing that the employer's stated reason for the decision was pretextual. *Id.* While this test allows the employee to survive a motion for summary judgment or half-time motion based on circumstantial evidence, it also permits an employer to prevail if the employee is unable to show pretext.

Alternatively, if an employee has direct evidence of their employer's retaliatory motivation, the direct evidence test applies. *Hegwine v. Longview Fibre Co., Inc.*, 162 Wn.2d 340, 359, 172 P.3d 688 (2007) (noting that a WLAD claim

---

[5] The *McDonnell Douglas* burden-shifting framework originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Washington courts have largely adopted this framework for evaluating discrimination cases "where the plaintiff lacks *direct* evidence of discriminatory animus," *see Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 180, 23 P.3d 440 (2001), *overruled on other grounds by Mikkelsen v. Pub. Util. Dist. No. 1 of Kittias County*, 189 Wn.2d 516, 529-32, 404 P.3d 464 (2017).

[6] Although Washington courts frequently refer to a plaintiff establishing the elements of a WLAD claim as having established a "prima facie case," that terminology is inapplicable where, as here, an employee seeks to prove a WLAD claim under the direct evidence test instead of the *McDonnell Douglas* framework. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1292 (11th Cir. 1999) ("The phrase 'prima facie case'" . . . has a meaning under the traditional framework very different from its meaning under *McDonnell Douglas*—in the former case it means a case strong enough to go to a jury.").

"supported by direct, as opposed to circumstantial, evidence . . . . is not to be analyzed under the three-step protocol from *McDonnell Douglas*") (internal citation omitted). Direct evidence includes "discriminatory statements by a decision maker and other 'smoking gun' evidence of discriminatory motive." *Fulton v. Dep't of Soc. and Health Servs.*, 169 Wn. App. 137, 148 n.17, 279 P.3d 500 (2012) (quoting *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 179, 23 P.3d 440 (2001)). Under the direct evidence test, the employee must produce "direct evidence that the defendant acted with a discriminatory motive and that the discriminatory motivation was a 'significant or substantial factor in an employment decision.'" *Kastanis v. Educ. Emps. Credit Union*, 122 Wn.2d 483, 491-92, 859 P.2d 26 (1993) (quoting *Buckley v. Hosp. Corp. of Am., Inc.*, 758 F.2d 1525, 1529 (11th Cir. 1985)). If the employee makes this showing, the employer must "show, by a preponderance of the evidence, that the same decision would have been reached absent the discriminatory factor." *Id.* "In the face of such evidence, the case goes to the jury."[7] *Id.* While this test requires direct evidence, it allows an employee to avoid the distinct burden of showing pretext.

---

[7] While we are unaware of any Washington case that has applied the direct evidence test to a retaliation claim, federal courts have done so. *See e.g.*, *Walton v. Harker*, 33 F.4th 165, 171 (2022) ("Employees may prove that their employer retaliated against them for engaging in protected activity through one of two ways: (1) by direct evidence of retaliatory animus; or (2) through the *McDonnell Douglas* burden shifting-framework.") (internal citation omitted); *Naguib v. Trimark Hotel Corp.*, 903 F.3d 806, 811 (8th Cir. 2018) ("[R]etaliation claims may be proved by either direct evidence or under the *McDonnell Douglas* burden-shifting framework); *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) (distinguishing between the "indirect" method of proving retaliation under the *McDonnell Douglas* test and the "direct" method of proving retaliation using direct evidence). Although these federal cases are nonbinding, we are "free to adopt those theories and rationale which best further the purposes and mandates" of the WLAD. *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481, 491, 325 P.3d 193 (2014).

Lastly, where, as here, this issue is decided on summary judgment, "[t]he moving party bears the initial burden 'to prove by uncontroverted facts that there is no genuine issue of material fact.'" *Welch v. Brand Insulations, Inc.*, 27 Wn. App. 2d 110, 115, 531 P.3d 265 (2023) (quoting *Jacobsen v. State*, 89 Wn.2d 104, 108, 569 P.2d 1152 (1977)). If the moving party meets this burden, then the burden shifts to the nonmoving party to produce "'specific facts evidencing a genuine issue of material fact for trial.'" *Id.* (quoting *Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d 665 (1995)). Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." CR 56(c). "This court reviews a motion for summary judgment de novo, construing all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party." *Blue Diamond Grp., Inc. v. KB Seattle 1, Inc.*, 163 Wn. App. 449, 453, 266 P.3d 881 (2011).

B.      Proof of retaliation

With these principles in mind, we turn to Bittner's retaliation claims. We conclude that Bittner has produced sufficient evidence under the direct evidence test to establish fact issues regarding the three elements of his retaliation claims and to survive a motion for summary judgment on those claims.

1.      Protected activity

Bittner argues he produced sufficient evidence to establish fact issues as to whether he engaged in protected activity under the WLAD. We agree.

To determine whether Bittner's conduct amounts to protected activity, we must interpret the WLAD. When interpreting a statute, we begin with the statute's

plain language to give effect to the legislature's intent. *Jin Zhu*, 189 Wn.2d at 613-14. Given the WLAD's important purpose of eliminating and preventing discrimination, "even in a plain language analysis, the WLAD's provisions must be given 'liberal construction.'" *Id.* (quoting *Marquis*, 130 Wn.2d at 109). We may also discern a statute's plain meaning by consulting the text of related statutes or other provisions in the same act. *Id.* at 616.

We have previously acknowledged that the WLAD's retaliation provision, RCW 49.60.210(1), "extends broad protections to 'any person' engaging in statutorily protected activity from retaliation." *Currier v. Northland Servs., Inc.*, 182 Wn. App. 733, 742, 332 P.3d 1006 (2014). The statute generally provides two types of protection to employees. The first, known as the "opposition clause," protects employees who have "opposed any practices forbidden by [the WLAD]." *Lodis v. Corbis Holdings, Inc.*, 172 Wn. App. 835, 848, 292 P.3d 779 (2013) (quoting RCW 49.60.210(1)). The second, known as the "participation clause," protects employees who have "file[d] a charge, testifie[d], or assist[ed] in any proceeding under this chapter." *Id.* (citing RCW 49.60.210(1)). The list of prohibited retaliatory actions in RCW 46.60.210(1) is "explicitly not exclusive," and "specific statutory terms may reasonably inform courts as to the meaning of broader statutory terms." *Jin Zhu*, 189 Wn.2d at 618.

Construing the WLAD liberally, as we must, we conclude that Bittner has established fact issues as to whether he engaged in protected activity. After Rotz expressed to Bittner her dissatisfaction with how Symetra HR responded to her complaint accusing Manning of harassment and discrimination, Bittner told her,

"[Y]ou need to get legal advice. This isn't right." And when Doe expressed similar sentiments about how Symetra failed to meaningfully address her complaint accusing Koettker of sexual harassment and discrimination, Bittner likewise suggested that she should "seek legal advice and find out what she can do." Bittner also reported his own concerns to HR about Rotz and Doe being subjected to harassment and discrimination at Symetra. Lastly, when Bittner suspected that Symetra's executives were managing out Jaggers due to his age to get "younger members on the team," Bittner warned Jaggers that he should seek legal advice because "if something happens to me, I hope you know your rights." Bittner also sent an e-mail to his superiors voicing his opposition to their directive to manage out Jaggers in which he stated, "I just don't think it is right and would need to navigate properly to avoid any view of discrimination against myself or [Jaggers]."

On this record, both the opposition clause and the participation clause are applicable. Bittner's conduct can be viewed as opposition to discrimination because he confronted discrimination against Rotz, Doe, and Jaggers and offered resistance to it. *See Lodis*, 172 Wn. App. at 848 (noting that "oppose," which is not defined in the WLAD, means "'to confront with . . . objections' and 'to offer resistance to, contend against, or forcefully withstand.'" (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1583 (2002)). Bittner reported to HR his concerns about Rotz, Doe, and Jaggers being discriminated against, and he told his superiors that he opposed age discrimination against Jaggers shortly before he was initially terminated. Additionally, Bittner's conduct can be viewed as having assisted in a WLAD proceeding because he was encouraging employees to initiate

legal action against Symetra, which Rotz and Doe ultimately did.[8] Viewing this evidence in the light most favorable to Bittner, we conclude he has established fact issues regarding the first element of his retaliation claims.

Notwithstanding the foregoing analysis, Symetra posits that Bittner's conduct was not protected activity because it "directly interfered with the obligations Bittner owed to Symetra as an officer and senior manager." But interpreting the WLAD such that a high-level employee cannot oppose discriminatory practices is antithetical to the act's purpose of "deter[ring] and eradicat[ing] discrimination in Washington—a public policy of the highest priority." *See Lodis*, 172 Wn. App. at 848. Indeed, we have previously acknowledged that "HR, management, and legal employees" are "often the best situated to oppose an employer's discriminatory practices" and depriving them of protection from retaliation "would create a disincentive for such employees to carry out their ordinary job duties, which often includes ensuring company compliance with employment and antidiscrimination laws." *Id*. at 851.

---

[8] Relatedly, federal courts have held that consulting with an attorney to remedy unlawful discrimination is protected activity under the federal anti-retaliation statute codified in Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-3. *See, e.g., Martin v. Gen. Elec. Co.*, 891 F. Supp. 1052, 1060 (E.D. Pa. 1995) (employee engaged in protected activity "when he sought legal advice and had his attorney notify [employer] that he intended to seek redress for a possible age discrimination claim"); *see also* EEOC Dec. No. 84-3 (1984) ("If . . . the [employer] discharged [the employee] as a result of her complaining of the sexual harassment and consulting an attorney about her legal rights, the [employer's] action constitutes a violation" of Title VII). Similarly, Ward, a senior partner in Symetra HR, acknowledged below that "every employee has a right . . . to seek legal advice and representation. . . . We can't stop an employee from doing that." Symetra's counsel also acknowledged at oral argument that the WLAD prohibits an employer from retaliating against an employee who seeks legal counsel in response to being subjected to discriminatory practices forbidden by the WLAD. Wash. Ct. of Appeals oral argument, *Bittner v. Symetra Life Ins. Co.*, No. 85708-8-I (Sept. 19, 2024), at 14 min., 45 sec. to 18 min., 50 sec. (on file with court). The same reasoning extends to Bittner, who advised other employees who have been subjected to discrimination prohibited by the WLAD to seek legal counsel to remedy the discrimination.

In support of its contrary position, Symetra cites to *Gogel v. Kia Motors Manufacturing of Georgia, Inc.*, 967 F.3d 1121 (11th Cir. 2020) (en banc), in which the Eleventh Circuit held that an employee's "recruitment of a subordinate to sue the company" did not constitute protected oppositional conduct under Title VII because it "so interfere[d] with the employee's performance of her job that it render[ed] her ineffective in the position for which she was employed." *Id.* at 1139-44 (citing *Rosser v. Laborers' Int'l Union of N. Am., Local No. 438*, 616 F.2d 221 (5th Cir. 1980)). This federal authority is unpersuasive because, as explained above, our court has expressly disavowed such a standard that would require HR, management, and legal employees to prioritize their duty to insulate the company from legal liability over their desire to eliminate and prevent discrimination in the workplace. *See Lodis*, 172 Wn. App. at 851. Additionally, Bittner merely suggested to other employees that they seek legal advice—he did not recruit them to do so—and this conduct did not so interfere with the performance of his job that it rendered him ineffective as an RVP. On this record, *Gogel* is inapposite.

Symetra also claims that "[t]he record does not support Bittner's claim that he opposed discrimination on behalf of others" because "nothing beyond Bittner's assertions in this lawsuit supports that" claim. This argument misrepresents the record and misunderstands Bittner's burden of production to survive a motion for summary judgment. "[O]n summary judgment a nonmoving party's declaration must be taken as true and can create a genuine issue of material fact even if it is 'self-serving.'" *Mackey*, 12 Wn. App. 2d at 575; *see also Haley v. Amazon.com Servs., LLC*, 25 Wn. App. 2d 207, 220, 522 P.3d 80 (2022) ("[C]lassifying a party's

declaration as 'self-serving' is essentially meaningless. *All* evidence submitted by a party should be self-serving."). Here, Bittner stated in his sworn declaration and deposition testimony that he told Doe and Rotz to seek legal advice, and the record contains numerous examples of Symetra admitting that it knew Bittner had done so. Bittner also provided similar statements regarding his opposition to age discrimination against Jaggers, and he produced an e-mail in which he documented these concerns to his superiors. Construed in the light most favorable to Bittner, this evidence creates genuine fact issues as to whether he engaged in protected conduct.

2. Adverse action

Turning to the second element of Bittner's retaliation claim, an adverse employment action is "a change in employment that is more than an inconvenience or alteration of one's job responsibilities," and it includes a demotion, adverse transfer, or hostile work environment. *Boyd v. Dep't of Soc. and Health Servs.*, 187 Wn. App. 1, 13, 349 P.3d 864 (2015). To satisfy this element, the employee must show that "a reasonable employee would have found the challenged action materially adverse, meaning it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). "[W]hether a particular action would be viewed as adverse by a reasonable employee is a question of fact appropriate for a jury." *Id.*

Here, Bittner has produced sufficient evidence showing he was subjected to an adverse action. After Bittner's superiors discovered that he had advised Doe

and Rotz to seek legal advice, they issued verbal and written reprimands to Bittner in July 2018, placed him on a PIP in February 2019, and planned to terminate him in October 2019. After Bittner expressed his opposition to his superiors' efforts to manage out Jaggers, Symetra initially terminated Bittner's employment, cut off his access to Symetra's systems, and ultimately placed another employee in his position in January 2020. A reasonable juror could find that these actions, especially when taken together, were materially adverse.

Symetra claims no adverse action occurred because it did not terminate Bittner's employment but rather "filled his role," which "had no adverse impact on Bittner" because "he could not have performed in the role at that time, as he was not medically cleared to work." This argument fails because termination is not the only form of adverse action; issuing a written reprimand, cutting off an employee's access to company systems, and removing an employee from their position—all of which occurred here—may constitute adverse actions. *See Boyd*, 187 Wn. App. at 14 (being "issued a written reprimand" may be an adverse action); *Alonso v. Qwest Commc'ns Co., LLC*, 178 Wn. App. 734, 746-47, 315 P.3d 610 (2013) (losing benefits associated with a position, such as a phone and computer, may be an adverse action). Moreover, a reasonable juror could conclude that Bittner was effectively terminated from his RVP position, even if Symetra did not do so formally. Thus, we conclude Bittner has established fact issues regarding the second element of his retaliation claims.

3.    Causation

To satisfy the third element of his retaliation claims, Bittner must show that retaliation was a "substantial factor" motivating the adverse action. *Cornwell*, 192 Wn.2d at 412. A substantial factor "must be a significant motivating factor, but need not be the sole factor, or even a determining factor, in the decision." *City of Seattle v. Am. Healthcare Servs., Inc.*, 13 Wn. App. 2d 838, 858, 468 P.3d 637 (2020). "When the record contains reasonable but competing inferences of both discrimination and nondiscrimination, the trier of fact must determine the true motivation." *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 445, 334 P.3d 541 (citing *Rice v. Offshore Sys., Inc.*, 167 Wn. App. 77, 90, 272 P.3d 865 (2012)).

Here, Bittner produced on summary judgment the following evidence of Symetra's retaliatory intent. In September 2017, Ward e-mailed Fry asking whether they should offer "coaching" to Bittner because he "has given some bad advice to employees in the past who are feel[ing] disgruntled with Symetra, e.g. you should seek legal advice" and "[m]y concern is that he will do the same with [Doe]." In July 2018, shortly after Symetra concluded its investigation into Doe's claim, Ward instructed Fry in an e-mail to tell Bittner to stop "[a]dvising employees to seek legal advice. . . . It's not your place to tell any Symetra employee to seek legal advice, e.g. D. Rotz." Following that meeting, Fry wrote a letter to Bittner that outlined performance areas that "need[] to improve" and instructed him to stop "[a]dvising employees to seek legal advice" and to "[k]now when to listen and keep quiet." Fry and Costello both conveyed to Bittner that he "would be fired" if he continued telling Symetra employees to seek legal advice because he "hurt the

organization, cost the organization money, . . . required additional legal resources." When Ward was asked in his deposition whether it was "appropriate for Mr. Fry to tell Mr. Bittner [to] stop telling employees to seek legal advice," he responded, "[G]iven that [Fry] knew that [Bittner] had done that, specifically Debbie Rotz, yes, I think it was appropriate" because "it's logical to me that a company would want to avoid litigation as much as possible." Symetra's CR 30(b)(6) designee similarly testified, "[I]nstead of telling employees to seek legal advice . . . we have this . . . internal process that we really want to be able to go through."

Viewing this evidence in the light most favorable to Bittner and drawing all reasonable inferences therefrom in his favor, a reasonable juror could conclude that Symetra's retaliatory motive was a substantial factor in the adverse actions. Additionally, these statements by Symetra constitute direct evidence of Symetra's retaliatory intent because they reveal that its employment decisions regarding Bittner were motivated by a desire to retaliate against him for engaging in protected activity. *See Fulton*, 169 Wn. App. at 148 n.17. Thus, Bittner has produced sufficient direct evidence to survive summary judgment on his retaliation claim.

Symetra maintains we should apply the *McDonnell Douglas* framework instead of the direct evidence test because Bittner "has presented no 'direct evidence' of discriminatory intent." But rather than explain why Bittner's evidence is not "direct," Symetra merely points to the "legitimate, nondiscriminatory reasons for any adverse actions [Bittner] alleges were taken."[9] This argument is

---

[9] These reasons include performance issues such as failing to share metrics, attend meetings, pursue business opportunities, engage in one-on-one meetings with sales representatives, and help sales representatives develop new producer contracts and address performance issues.

fundamentally flawed because it misstates the applicability of the *McDonnell Douglas* framework. Because the record contains direct evidence of Symetra's retaliatory motive, Bittner does not need to show that Symetra's proffered legitimate, non-retaliatory reasons for its actions are pretextual to survive summary judgment. *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1191 (11th Cir. 1997) ("Because we hold that [the employee] has presented sufficient direct evidence to survive summary judgment, we do not address his *McDonnell Douglas* argument and whether he has presented evidence of pretext.").[10] The jury must determine Symetra's true motivation.

Next, Symetra asserts four distinct arguments that, it claims, disprove any causal connection between Bittner's protected activity and any adverse action.

---

Symetra also presented evidence of Bittner's unprofessional behavior in the workplace, including his failure to prevent a subordinate from acting inappropriately at a work event in 2012, being accused of making "unsupportive comments" regarding another female employee's "breast pumping needs," sending a text message to Doe after she settled with Symetra that violated the settlement agreement's non-disparagement provision, playing "personal rave videos" at a work event, and being accused by an employee of another company of approaching her at a work event, placing his hand on her back, and saying, "Can you tell me your name so I don't have to look at your boobs."

[10] Even if we were to analyze Bittner's retaliation claims under the *McDonnell Douglas* framework, we would conclude that he has shown pretext. To show pretext, Bittner must produce "sufficient evidence to create a genuine issue of material fact either (1) that the employer's articulated reason for its action is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." *Scrivener*, 181 Wn.2d at 441-42. Here, Ward e-mailed Fry about his "concern" that Bittner was offering "bad advice" to "disgruntled" employees such as Doe to seek legal advice. Ward then instructed Fry to tell Bittner that "[i]t's not your place to tell any Symetra employee to seek legal advice, e.g. D. Rotz." Fry did so, and he later categorized this issue as an "area . . . where your performance as a sales leader . . . needs to improve." Costello and Fry effectively told Bittner that he "would be fired" if he continued telling employees to seek legal advice. Immediately after these discussions with Bittner in July 2018, his superiors began raising the critiques of his performance as an RVP that contributed to Bittner being placed on a PIP in February 2019, initially terminated in October 2019, and ultimately replaced in January 2020. Additionally, Bittner complained to his superiors about perceived age discrimination against Jaggers just before he was initially terminated in October 2019. Viewing this evidence in the light most favorable to Bittner, a reasonable juror could conclude that Symetra's legitimate, nonretaliatory reasons for taking the adverse actions are pretextual or that retaliation was a substantial factor motivating Symetra.

First, it points to a lack of temporal proximity between Bittner telling Rotz and Doe to seek legal advice in 2014 and when he was removed from his RVP role in 2020. This argument ignores that Fry, Ward, and others instructed Bittner to stop telling other employees to seek legal advice in July 2018, shortly after Symetra completed its investigation into Doe's claims and right before Bittner's superiors began raising the concerns about his performance that would ultimately contribute to the company's decision to remove him from his RVP position. Moreover, the cases cited by Symetra on this point are inapposite because they involve employees who, unlike Bittner, relied solely on circumstantial evidence to prove causation.[11]

Second, Symetra notes that it rewarded Bittner after he engaged in protected activity by promoting him in 2015 and honoring him with the President's Club award based on his team's sales numbers from 2014 to 2019. This argument fails because we have previously rejected employers' reliance on "grant[ing] a raise or promotion prior to implementing a termination as a means of decreasing their exposure to a valid retaliation claim." *Lodis*, 172 Wn. App. at 853. Additionally, Symetra first learned that Bittner had urged other employees to seek legal advice no earlier than 2016—after Bittner was promoted. The record also indicates that RVPs receive the President's Club award so long as their sales team

---

[11] *See Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 862, 991 P.2d 1182 (2000) (where an employee "must resort to circumstantial evidence to demonstrate retaliatory purpose," temporal proximity is "[o]ne factor supporting retaliatory motivation") (emphasis added) (quoting *Vasquez v. State*, 94 Wn. App. 976, 985, 974 P.2d 348 (1999)); *Ellorin v. Applied Finishing Inc.*, 996 F. Supp. 2d 1070, 1090-91 (W.D. Wash. 2014) (where employee seeks to establish causation "only on the basis of 'temporal proximity . . . the temporal proximity must be very close.'") (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam)); *Macon v. United Parcel Serv., Inc.*, No. C12-260 RAJ, 2012 WL 5410289, at *6 (W.D. Wash. Nov. 5, 2012) (dismissing retaliation claim where employee "relie[d] entirely on temporal proximity to establish causation").

meets its sales quota for a given year (which Bittner's team did from 2014 to 2019), not for other qualitative achievements by the RVP.

Third, Symetra contends there is a "lack of management continuity" because Fry, the employee who reprimanded Bittner in July 2018 for engaging in protected activity, "had no involvement in the October 2019 decision to terminate Bittner's employment." This argument ignores that Ward, who was also involved in the decision to terminate Bittner, instructed Fry before his July 2018 meeting with Bittner to reprimand him for telling others to seek legal advice. Additionally, Costello, who was also involved in the decision to terminate Bittner, "told [Bittner] pretty much [he] was going to get fired" if he told another employee to seek legal advice. This evidence, at the very least, establishes fact issues regarding continuity between the persons who opposed Bittner's protected activity and those who subjected him to adverse actions.

Fourth, Symetra argues there is no causal connection between Bittner's opposition to age discrimination against Jaggers and any adverse action because Bittner e-mailed his concerns about age discrimination to Costello on October 15, 2019, but Costello, Freestone, and Ward had already decided on October 10, 2019 to terminate Bittner's employment. This argument is unconvincing because, even assuming Symetra management planned to fire Bittner before he sent the e-mail, they "pulled the term[ination] back" and did not fill Bittner's position with another employee until January 2020. Symetra's position is internally contradictory; it claims it already decided to terminate Bittner in October 2019, while also asserting that it never terminated Bittner because he resigned in March 2020. By the time

Bittner opposed age discrimination against Jaggers, Symetra knew he had previously opposed discrimination against Doe and Rotz. *See Wilmot v. Kaiser Alum. & Chem. Corp.*, 118 Wn.2d 46, 69, 821 P.2d 18 (1991) (noting "[e]vidence of an actual pattern of retaliatory conduct is, of course, very persuasive" evidence of an employer's improper motive) (quoting 1 L. Larson, § 6.05[5], at 6–51)). A reasonable juror could conclude that Bittner's opposition to age discrimination against Jaggers was a substantial factor motivating the adverse actions.

In sum, Bittner has produced sufficient direct evidence that, when construed in his favor, creates genuine issues of material fact regarding whether Symetra retaliated against him for engaging in protected activity under the WLAD. Therefore, the trial court erred in dismissing his WLAD retaliation claims on summary judgment.[12]

III

Bittner next argues the trial court erroneously dismissed his disability discrimination claims on summary judgment. We disagree.

The WLAD prohibits an employer from discriminating against any person because of "the presence of any sensory, mental, or physical disability." RCW 49.60.180(3). "There are two types of disability discrimination claims: disparate

---

[12] Bittner also argues, "Because the erroneous summary judgment ruling deprived Bittner of a fair trial on his equitable claims, this Court should vacate the judgment in favor of Symetra on those claims as well." For support, Bittner cites two cases standing for the proposition that a trial court may remand for a new trial on the issue of damages, but these cases involved errors that occurred at trial with respect to jury instructions, as opposed to errors that occurred at the pre-trial summary judgment stage of proceedings. *See McCurdy v. Union Pac. R.R.*, 68 Wn.2d 457, 471, 413 P.2d 617 (1966); *Nelson v. Fairfield*, 40 Wn.2d 496, 501, 244 P.2d 244 (1952). Bittner's reliance on *Income Invs. v. Shelton*, 3 Wn.2d 599, 602, 101 P.2d 973 (1940), is also misplaced because that case discusses the doctrine of unclean hands, which is not at issue in this appeal. Therefore, we decline to vacate the judgment in favor of Symetra on Bittner's equitable claims on this basis.

treatment and failure to accommodate." *Clipse v. Commercial Driver Servs., Inc.*, 189 Wn. App. 776, 792, 358 P.3d 464 (2015). "An employer who discharges, reassigns, or harasses for a discriminatory reason faces a disparate treatment claim; an employer who fails to accommodate the employee's disability, faces an accommodation claim." *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 640, 9 P.3d 787 (2000) (quoting *Hill v. BCTI Income Fund-I*, 97 Wn. App. 657, 667, 986 P.2d 137 (1999)) (overruled on other grounds by *McClarty v. Totem Elec.*, 157 Wn.2d 214, 226, 137 P.3d 844 (2006)). While this case arguably presents both a disparate treatment claim and a failure to accommodate claim, we decline to address whether the trial court erroneously dismissed Bittner's disparate treatment claim because Bittner fails to sufficiently brief that issue as required by RAP 10.3(a)(6).[13]

While Bittner argues we should analyze his failure to accommodate claim under the direct evidence test, we decline to do so because he does not identify any direct evidence of disability discrimination. As with other WLAD claims, we analyze disability discrimination claims under the three-step *McDonnell Douglas* burden shifting framework where, as here, the employee lacks direct evidence of their employer's discriminatory intent. *See Am. Healthcare Servs.*, 13 Wn. App. 2d at 855-56. For purposes of appeal, Bittner does not dispute that Symetra

---

[13] Bittner assigns error to the trial court's dismissal of a singular "disability discrimination claim," without specifying whether this claim relates to failure to accommodate or disparate treatment. In Bittner's statement of the issues and argument in his opening brief, he solely discusses his failure to accommodate claim and does not provide any argument regarding his disparate treatment claim. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

satisfies the second *McDonnell Douglas* step.  Instead, he focuses on the first and third steps.  We assume for purposes of our discussion that Bittner can establish fact issues as to a prima facie claim of failure to accommodate (the first *McDonnell Douglas* step) and that Symetra has articulated a legitimate, nonretaliatory reason for the employment decision (the second *McDonnell Douglas* step).  For Bittner to satisfy his burden on summary judgment under the third *McDonnell Douglas* step, he must produce "sufficient evidence to create a genuine issue of material fact either (1) that the employer's articulated reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer."  *Scrivener*, 181 Wn.2d at 441-42*.* Bittner claims he has produced such evidence for three reasons, but we reject each of them.

First, Bittner argues that he "became temporarily disabled as a result of Symetra's threats and intimidation" and that he "needed leave because he developed several medical conditions, including anxiety and depression, as a result of the stress from Symetra's discriminatory and retaliatory actions."  This argument fails because, although the record contains evidence that Bittner had been diagnosed with anxiety and depression by January 2020, Bittner has not cited any evidence in the record showing that Symetra's actions caused him to be diagnosed with anxiety and depression.  Nor has Bittner identified any evidence showing that he informed Symetra that he was suffering from anxiety and depression when he took his medical leave in October 2019.  Instead, the record shows that Bittner's disability related to gastrointestinal issues stemming primarily

from diverticulitis. Bittner solely referenced his gastrointestinal issues when describing his disability in his complaint and summary judgment briefing below. But no evidence indicates that Symetra's actions caused Bittner's gastrointestinal issues. Thus, the record does not support Bittner's contention that he became disabled as a result of Symetra's actions.

Second, Bittner contends Symetra replaced him due to performance issues that Symetra knew were caused by his disability. In support of this contention, Bittner points to an e-mail from December 2018 in which Fry criticized Bittner for missing a meeting that Bittner claims to have missed due to diverticulitis. But the text of the e-mail reveals that Fry's concerns did not relate to Bittner's diverticulitis but instead to Bittner's repeated failure to attend meetings without notice. In the e-mail, Fry assured Bittner, "I am sorry that you were/are under the weather and wish you a speedy recovery. I know that diverticulitis is not something to take lightly." Additionally, Bittner admitted in his deposition testimony that he missed meetings for reasons other than diverticulitis.

Third, Bittner avers that Symetra's act of replacing him while he was on medical leave is itself evidence of a discriminatory animus. The record belies this assertion. Symetra did not require Bittner to return to work before his doctor had medically cleared him to do so, nor did Symetra force Bittner to perform duties that exacerbated or interfered with his management of his gastrointestinal issues. To the contrary, Symetra allowed Bittner to remain on leave and retain his employee benefits, and Symetra's leave consultant encouraged Bittner to apply for long-term disability coverage through the company after his short-term disability expired.

Even construing the evidence in the light most favorable to Bittner, it is apparent that Symetra's employment decisions were not motivated by Bittner's health issues but instead by his performance deficiencies and workplace behavioral issues (and potentially retaliation, as discussed above). Because Bittner has failed to show pretext or that disability discrimination was a substantial factor motivating Symetra's decision-making, he has not met his burden under the third *McDonnell Douglas* step.[14] Therefore, the trial court correctly dismissed Bittner's WLAD failure to accommodate claim on summary judgment.

IV

Bittner argues we should vacate the trial court's award of $30,904.23 in costs to Symetra under RCW 4.84.010 following the jury trial because it is no longer a prevailing party. Because we reverse the trial court's summary judgment ruling on Bittner's WLAD retaliation claims and vacate the trial court's final judgment, we also vacate the trial court's cost award as premature, as the substantially prevailing party has not yet been determined. Nonetheless, we exercise our discretion to address Bittner's five arguments relating to certain costs awarded to Symetra under RCW 4.84.010 because these issues are likely to recur on remand regardless of which party prevails.[15]

---

[14] For these same reasons, even if we considered Bittner's disparate treatment claim on the merits instead of finding waiver, we would conclude with regard to this claim that Bittner fails to overcome the third *McDonnell Douglas* step because he has not shown that Symetra's reasons for its employment decisions were pretextual. *See Marin v. King County*, 194 Wn. App. 795, 808-09, 378 P.3d 203 (2016) (quoting *Kirby v. City of Tacoma*, 124 Wn. App. 454, 467, 98 P.3d 827 (2004)) (pretext may be shown under the third *McDonnell Douglas* step if the employer's reasons "(1) have no basis in fact, (2) were not really motivating factors for the decision, or (3) were not motivating factors in employment decisions for other employees in the same circumstances").

[15] Although we generally review cost awards for an abuse of discretion, we may choose to resolve legal errors that may recur on remand. *See In re Marriage of Rockwell*, 157 Wn. App. 449, 454,

First, Bittner argues the trial court erroneously awarded expert witness fees to Symetra. We agree. "Costs have historically been very narrowly defined, and RCW 4.84.010 limits cost recovery to a narrow range of expenses . . . ." *Hume v. Am. Disposal Co.*, 124 Wn.2d 656, 674, 880 P.2d 988 (1994). In *Estep v. Hamilton*, 148 Wn. App. 246, 201 P.3d 331 (2008), Division Three of our court noted that "our Supreme Court has recognized there are no grounds for awarding expert witness fees as costs" and ultimately held that "RCW 4.84.010 does not authorize expert witness fees in an award of costs to the prevailing party." *Id.* at 263 (citing *Wagner v. Foote*, 128 Wn.2d 408, 417-18, 908 P.2d 884 (1996), and *Fiorito v. Goerig*, 27 Wn.2d 615, 620, 179 P.2d 316 (1947)). Although the WLAD creates a statutory basis for a prevailing *plaintiff* to recover expert witness fees, the act does not entitle a prevailing *defendant* to recover such fees. *See Xieng v. Peoples Nat. Bank of Wash.*, 120 Wn.2d 512, 526-30, 844 P.2d 389 (1993) (noting that RCW 49.60.030(2) permits the "person deeming himself injured by any act in violation" of the WLAD to recover costs of suit). Accordingly, the trial court erred in awarding Symetra's expert witness fees.

Second, Bittner argues the trial court erred by awarding costs to Symetra under RCW 4.84.010(7) for the fees charged by videographers who videotaped depositions. We agree. The plain language of RCW 4.84.010(7) indicates that videographer fees are not recoverable because they do not relate to the transcription of a deposition. *See* WEBSTER'S THIRD NEW INTERNATIONAL

---

238 P.3d 1184 (2010) (addressing whether, as a matter of law, prejudgment interest may properly be awarded on remand "[b]ecause this issue is likely to recur on remand").

DICTIONARY 2426 (2002) (defining "transcribe" as "to make a written copy of").

Accordingly, the trial court erred in awarding Symetra's videographer fees under

RCW 4.84.010.

Third, Bittner argues the trial court erred in awarding costs pursuant to RCW

4.84.010(7) for the transcriptions of certain depositions on a gross rather than pro

rata basis. We agree. Under RCW 4.84.010(7), the prevailing party may recover

only the following costs relating to the transcription of depositions:

> To the extent that the court . . . finds that it was necessary to achieve the
> successful result, the reasonable expense of the transcription of depositions
> used at trial . . . : PROVIDED, That the expenses of depositions shall be
> allowed on a pro rata basis for those portions of the depositions introduced
> into evidence or used for purposes of impeachment.

While the record supports a gross award of costs of transcribing certain

depositions (such as Bittner's deposition, to which Symetra's counsel extensively

referred at trial), the record also indicates that other transcripts were used sparingly

(such as Brandt's deposition, of which Symetra included only three pages in a

motion in limine seeking to exclude him as a witness). Symetra also recovered

$330 associated with De Lima's deposition, but the record contains no explanation

of or supporting invoice for this cost. On remand, the trial court should only award

transcription costs in accordance with RCW 4.84.010(7), which requires that such

expenses be (a) necessary to achieve the successful result, (b) reasonable, (c)

related to the transcription of depositions used at trial, and (d) allowed on a pro

rata basis for the portions of the depositions introduced into evidence or used for

purposes of impeachment.

Fourth, Bittner argues the trial court erroneously awarded costs to Symetra for "process server fees" under RCW 4.84.010(2) because that statute "does not encompass service of subpoenas for depositions" but rather only "the procedure by which a party to a lawsuit serves a complaint and summons." We agree. Our court has previously recognized that "[s]ervice of process refers to a formal delivery of documents that is legally sufficient to charge the defendant with notice of a pending action." *Larson v. Yoon*, 187 Wn. App. 508, 515, 351 P.3d 167 (2015) (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700, 108 S. Ct. 2104, 100 L. Ed. 2d 722 (1988)). Thus, the trial court erred in awarding Symetra process server fees incurred in serving subpoenas on witnesses in foreign jurisdictions under RCW 4.84.010(2).

Fifth, Bittner argues the trial court erroneously awarded costs to Symetra under RCW 4.84.010(1) for "filing fees in King County, Washington, as well as in Illinois, Oregon, and California courts in order to issue subpoenas for out of state witnesses." We agree. In the instant case, Bittner is the only party who incurred filing fees to initiate this proceeding. Filing fees to initiate other proceedings in other jurisdictions are recoverable, if at all, in those other proceedings. The trial court erred in awarding such costs herein.

V

Lastly, Bittner requests attorney fees pursuant to RAP 18.1 and asks that we "note in [our] opinion that he may apply to recover his appellate fees from the trial court on remand should he prevail." While Bittner's attorney fee request is premature because he has not yet prevailed in this action, he is entitled to recover

- 30 -

his reasonable attorney fees associated with the WLAD retaliation issues in this appeal pursuant to RCW 49.60.030(2) should he prevail on his WLAD retaliation claims on remand.  See *Kries v. WA-SPOK Primary Care, LLC*, 190 Wn. App. 98, 144, 362 P.3d 974 (2015).  The trial court may consider this issue and award appropriate appellate fees if and when it is appropriate to do so.

Affirmed in part, reversed in part, and remanded.

Feldman, J.

WE CONCUR:

Díaz, J.

Birk, J.